# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

### 09-110

STATE OF LOUISIANA

VERSUS

ALTON LANE STROTHER

**********

APPEAL FROM THE
NINTH JUDICIAL DISTRICT COURT
PARISH OF RAPIDES, NO. 287123
HONORABLE THOMAS MARTIN YEAGER, DISTRICT JUDGE

**********

ULYSSES GENE THIBODEAUX
CHIEF JUDGE

**********

Court composed of Ulysses Gene Thibodeaux, Chief Judge, Marc T. Amy, and Shannon J. Gremillion, Judges.

**Amy, J., concurs in part, dissents in part, and assigns reasons.**

> **CONVICTION AND SENTENCE FOR ATTEMPTED SECOND DEGREE CRUELTY TO A JUVENILE REVERSED AND SET ASIDE. JUDGMENT OF ACQUITTAL ENTERED.**
>
> **CONVICTION FOR CRUELTY TO A JUVENILE AFFIRMED. SENTENCE VACATED. REMANDED FOR RESENTENCING.**

James C. Downs
District Attorney - 9th Judicial District Court
Monique Y. Metoyer
Assistant District Attorney
P. O. Drawer 1472
Alexandria, LA 71309
Telephone: (318) 473-6650
COUNSEL FOR:
      Plaintiff/Appellee - State of Louisiana

**Michael A. Brewer**
**1330 Jackson Street**
**Alexandria, LA 71301**
**Telephone:  (318) 443-4006**
**COUNSEL FOR:**
      **Defendant/Appellant - Alton Lane Strother**

**THIBODEAUX, Chief Judge.**

The Defendant, Alton Lane Strother, appeals his jury convictions and sentences for attempted second degree cruelty to a juvenile and cruelty to a juvenile. He was sentenced to serve consecutive ten-year terms at hard labor on each count. For the foregoing reasons, we reserve and vacate the Defendant's conviction and sentence for attempted second degree cruelty to a juvenile. We affirm his conviction for cruelty to a juvenile, but vacate his sentence due to excessiveness, and remand for resentencing.

## ISSUES

We shall consider whether:

(1) the evidence was insufficient to convict the Defendant of attempted second degree cruelty to a juvenile and cruelty to a juvenile;

(2) the ten-year sentences are excessive; and,

(3) the trial court erred in imposing consecutive sentences.

## LAW AND DISCUSSION

### Insufficiency of the Evidence

Defendant asserts that there was insufficient evidence to sustain the convictions for attempted second degree cruelty to juveniles and cruelty to juveniles. He asserts that the evidence was circumstantial and the State failed to disprove every reasonable hypothesis of innocence.

> When the issue of sufficiency of evidence is raised on appeal, the critical inquiry of the reviewing court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *Jackson v. Virginia,* 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 [*rehearing denied,* 444 U.S. 890, 100 S.Ct. 195, 62 L.Ed.2d 126] (1979); *State ex*

> *rel. Graffagnino v. King,* 436 So.2d 559 (La.1983); *State v. Duncan,* 420 So.2d 1105 (La.1982); *State v. Moody,* 393 So.2d 1212 (La.1981). The role of the factfinder is to weigh the respective credibility of each witness. Therefore, the appellate court should not second guess the credibility determinations of the factfinder beyond the sufficiency evaluations under the Jackson standard of review. *See State ex rel. Graffagnino,* 436 So.2d 559, citing *State v. Richardson,* 425 So.2d 1228 (La.1983).

*State v. Miller,* 98-1873, p. 5 (La.App. 3 Cir. 10/13/99), 746 So.2d 118, 120, *writ denied,* 99-3259 (La. 5/5/00), 761 So.2d 541. Additionally, in *State v. Ortiz,* 96-1609, p. 12 (La. 10/21/97), 701 So.2d 922, 930, *cert. denied,* 524 U.S. 943, 118 S.Ct. 2352 (1998), the Louisiana Supreme Court stated:

> When circumstantial evidence is used to prove the commission of the offense, La.R.S. 15:438 requires that "assuming every fact to be proved that the evidence tends to prove, in order to convict, it must exclude every reasonable hypothesis of innocence." This is not a separate test to be applied when circumstantial evidence forms the basis of a conviction; all evidence, both direct and circumstantial must be sufficient to satisfy a rational juror that the defendant is guilty beyond a reasonable doubt. *State v. Porretto,* 468 So.2d 1142 (La.1985).

E.L.,[1] the mother of the victim, was twenty-six at the time she testified at Defendant's trial. She had given birth to six children. Her first child died from sudden infant death syndrome. She gave her second child to her sister because the child had a heart problem, she had missed a doctor's appointment, and she feared that child protection services was going to put the child into foster care. She stated that she was told if she had any more children they would be taken away, so she gave her third baby to her sister at birth to avoid having that child taken from her custody and placed with foster parents. Her fourth child was living with his father.

---

[1]The initials of the victim and family members are used to protect the victim's identity. La.R.S. 46:1844(W).

At the time of the incident which resulted in Defendant's arrest, she had been living with him for six months with her fifth child, a three-year-old boy, who suffered from an unspecified disability, and an eight-month-old girl, the victim. They lived in Defendant's parents' trailer. Neither she nor Defendant was working. Defendant was on disability. She testified that Defendant was twenty-nine at the time.

E.L. testified that about three o'clock in the morning on February 2, 2007, the baby woke up crying. While the Defendant was changing the baby's diaper on top of the washing machine, the baby fell onto the dryer. E.L. noticed bruises on the baby's legs a few hours later. She said that she did not immediately call for help or take the baby to the hospital because "[h]e would not let me use the phone but to call the doctor's office and he was right there." She said that she went to her brother's house, then to the police department, and then to the hospital. When asked if he ever struck the baby, she testified that Defendant would slap the baby's hand with a fly swatter, and that he did not like her crying. Later, during cross-examination, she stated that he could not stand the crying and would "whip" her for crying.

The Defendant's statement to the police was admitted into evidence. In the statement, Defendant told the police that he had known E.L. about six months. He said he met her at someone's house and that she had "come in and rubbing and feeling on me," and they moved in together three days later. He said he moved her in because the man she was living with was a drunk and that he felt sorry for the kids. He said that on February 2, at about 3:00 a.m., the baby woke up crying. E.L. would not wake up. Consequently, he got up to change the baby. He explained that he had a bad back and was not supposed to pick up anything over five pounds. He said that he took the child into the laundry room and put her on the washing machine. After he had changed her, as he was pulling up her pants, she "jumped" out of his hands and fell

3

face first into the control panel of the dryer. When asked by the police if she fell to the floor, he said that she did not. He said that he noticed bruises on her face after he had put her down on the mattress, then got back up again to retrieve her pacifier which had slipped to the floor. Defendant told the police that he did discipline the children, spanking them on the bottom. He told the police he had swatted the victim once on the hand with a fly swatter. He said that he never saw E.L. abuse the children, but that he was not inside the trailer that much.

Ray Cooper, who worked for the Office of Community Service doing child protection investigations, testified that he had the opportunity to interview the parties, both E.L. and Defendant. He stated that Defendant told him "that 3:15 in the morning [B.] was crying, wouldn't hush. Ms. [L.] was laying there, she wouldn't get up, so he got up with the child. He has a bad back. He brought her into the washroom and as he's going into the washroom he dropped her."

Doctor Amarjit Nijjar, an expert in pediatric medicine, testified that he examined the victim the day following her admission to the hospital. He explained:

> [S]he had multiple, as I examined the baby, multiple bruising on the face, on the head, on the right side of the face, on the left side of the jaw, back of the neck, both ears were all red and swollen up. Her upper lip was swollen, and I lifted a little bit, of course very painful for the baby, there was a little wound underneath and--and slight blood started coming from there. On the side of the trunk, actually on the right side of the back there were bruising. There was redness of the abdomen. There was extensive bruising on both buttocks, and by feeling, and, of course very painful for the baby, underneath the muscle of--in the gluteus muscle in the hip area there was a swelling, it looks like a hemotoma[sic] or a blood collection under that muscle. On the right side, the right thigh and the right calf was bruised up. The left thigh, there was bruising as well as on the calf muscles. Her left arm was bruised up and she was not really moving her left arm very much. She was holding like this (indicating), with the other hand. On the right hand in the middle finger there was a collection of blood. It looked

4

like--we call it a small hemotoma[sic] in the--in the middle joint here somewhere.

The doctor testified that X-rays found a fracture of the lateral part of the humus bone, in the elbow area. He stated that there were indications of a prior fracture at the same location. He stated that the baby was in pain as a result of the fracture. He testified that the injuries appeared to be the result of repetitive abuse for the reason that the discoloration of the bruising indicated that the trauma which inflicted the bruises did not occur all at the same time.

Defendant's father, Jimmy Strother, testified that on the morning of February 2nd, he, his wife, Defendant, E.L., and the two children took a trip into town to cash Defendant's check and purchase cigarettes and diapers. He stated that after they returned to the trailer, Defendant left to go fishing, and he and Mrs. Strother left to run more errands. He stated he did not notice bruises on the baby, but that she was crying a lot. He further stated that when E.L. picked the baby up out of the baby seat "she grasped it with one arm -- and picked it up, and that wasn't the proper way to do a child, a baby."

Fay Strothers, Defendant's mother, testified that she was the one who cooked for the family and bought their food. She stated she had seen E.L. hit the baby with a belt and fly swatter. She said that she had warned E.L. that if she did not stop hitting the baby she would call social services. She stated that she had seen bruises on the victim several times, "[b]ecause she would throw it down--throw her down on the couch and she'd fall off the couch, and she'd have knots on her head where she'd hit the floor." She stated that she had seen Defendant discipline the baby by "patting" her on the bottom, but that she never saw him strike the victim in anger.

5

**Count one:  Attempted second degree cruelty to a juvenile:**

Defendant was charged with second degree cruelty to juveniles by bill of information as follows:

> **COUNT 1:**
>
> **IN THAT HE DID ON OR ABOUT THE 2ND DAY OF FEBRUARY, 2007**, being over the age of 17 (seventeen), intentionally or through criminal negligence, mistreat a child **D.O.B.:   5/8/06**, causing serious bodily injury or neurological impairment, in violation of La.R.S. 14:93.2.3[.]

He was convicted, however, of attempted second degree cruelty to juveniles.

Initially, we note that attempted second degree cruelty to juveniles is not a legislatively-designated responsive verdict to second degree cruelty to juveniles. However, Defendant did not object to the trial court instructing the jury that attempted second degree cruelty to juveniles was a responsive verdict. *State ex rel. Elaire v. Blackburn,* 424 So.2d 246 (La.1982), *cert. denied*, 461 U.S. 959, 103 S.Ct. 2432 (1983) held that if an accused did not object to an erroneous instruction regarding a responsive verdict, then the reviewing court may not reverse the conviction if the evidence is sufficient to support the offense charged.

In our view, there was insufficient evidence, direct or circumstantial, regarding an act or acts *by the Defendant* which would have resulted in the injury to the baby's arm on February 2.  Therefore, there was nothing to support a conviction for intentional or criminally negligent mistreatment or neglect of the child;

Second degree cruelty to juveniles is defined, in pertinent part, as:

> A.   (1) Second degree cruelty to juveniles is the intentional or criminally negligent mistreatment or neglect by anyone over the age of seventeen to any child under the age of seventeen which causes serious bodily injury or neurological impairment to that child.

6

(2) For purposes of this Section, "serious bodily injury" means bodily injury involving protracted and obvious disfigurement or protracted loss or impairment of the function of a bodily member, organ, or mental faculty, or substantial risk of death.

La.R.S. 14:93.2.3.

Doctor Dobson stated that the injury would have been caused by "a twisting injury or a fall from a height." He indicated that it could have occurred any time up to three days prior to his examination on the day following the 3:00 a.m. incident. While the diaper-changing incident occurred within the time frame of when the doctors theorized the injury occurred, Defendant's account of what happened did not indicate an injury to the baby's arm occurred at that time. He stated in his interview with the police that on the morning of February 2, 2007, he placed the baby on the washing machine to change her. As he was pulling up her pants, she "jumped" out of his hand and struck her face against the back of the dryer. He stated that later in the morning he saw bruises on her face.

The only testimony that the baby was dropped, or fell from a height the morning of the incident was given by an OCS investigator that Defendant had told him he dropped the baby on his way into the laundry room. During E.L.'s testimony, she stated Defendant changed the baby on the washing machine. She stated that she heard a "boom boom" sound, and the baby was crying when he brought her back into the living room. She said he told her the baby had wiggled out of his hands and fallen over on the dryer. E.L. did not find this to be unusual. She testified that "[s]he couldn't sit up all the way by herself just yet so she did wiggle. So I figured, you know, she just wiggled enough to where she just laid over." She said the baby stopped crying when he put her down on the mattress. E.L. testified that the next morning, she noticed bruises on the baby's legs when she changed her diapers. She made no

7

mention of whether the child's arm appeared to be injured that night, or anytime prior to February 2, 2007. There was no discussion of injury to the child's arm until the fracture was discovered by X-ray.

Here, the Defendant argues specifically that the State failed to exclude the reasonable hypothesis that it was the mother of the victim, who has a long documented history of neglect of her children, who inflicted the injury on the child. Furthermore, there was insufficient direct or circumstantial evidence of abuse, intent, knowledge or a gross deviation below the standard of care on the part of Defendant, that he was the one who caused the fracture to the victim's arm and that the fracture occurred in the early morning hours of February 2, 2007.

There was no testimony indicating that Defendant was alone with the baby when the injury to her arm occurred. While the Defendant did not testify, the jury heard the interview the police conducted with Defendant on the day the child was taken to the hospital. E.L.'s testimony was consistent with the statements Defendant made to the police. Obviously, the trier of fact had concerns with the evidence as given since they discarded the verdict of second degree cruelty to juveniles and imposed the unobjected to unresponsive verdict of attempted second degree cruelty to juveniles.

Where the evidence is insufficient to sustain the conviction for second degree cruelty to juveniles because there was minimal evidence submitted which could have established that the injury to the victim's arm was inflicted on February 2, 2007, by Defendant, it is axiomatic that there was insufficient evidence to support the conviction of attempted second degree cruelty to a juvenile under the theory of intentional mistreatment or neglect. Further, criminally negligent mistreatment or neglect is a legal impossibility for the reasons put forth in *State v. Cortez*, 96-859

8

(La.App. 3 Cir. 12/18/96), 687 So.2d 515. In *Cortez,* wherein the same problem of whether attempt was a responsive verdict to cruelty to juveniles existed, this court stated:

> Having found the evidence insufficient to sustain a conviction for cruelty to a juvenile, we now must determine whether the evidence was sufficient to support a conviction for *attempted* cruelty to a juvenile. As stated above, La.R.S. 14:93 defines cruelty to a juvenile as the intentional or criminally negligent mistreatment of a child, which causes the child to experience unjustifiable pain or suffering. La.R.S. 14:27 provides, in pertinent part, that an attempt includes:
>
> > A. Any person who, *having a specific intent to commit a crime*, does or omits an act for the purpose of and tending directly toward the accomplishing of his object is guilty of an attempt to commit the offense intended; and it shall be immaterial whether, under the circumstances, he would have actually accomplished his purpose.
>
> (Emphasis added).
>
> La.Code Crim.P. art. 814 lists the "only" responsive verdicts which may be rendered when indictments charge a defendant with certain offenses. Attempts for the various offenses listed in the statute are also provided, i.e. attempted first degree murder, attempted armed robbery, etc. La.Code Crim.P. art. 815 provides the responsive verdicts for crimes which are not listed under article 814. Article 815 states:
>
> > In all cases not provided for in Article 814, the following verdicts are responsive:
> >
> > (1) Guilty;
> >
> > (2) Guilty of a lesser and included grade of the offense even though the offense charged is a felony, and the lesser offense a misdemeanor; or
> >
> > (3) Not Guilty.
>
> In *State v. Anseman*, 607 So.2d 665, 668 (La.App. 5 Cir. 1992), *writs denied*, 613 So.2d 989, 990 (La.1993), our brethren of the fifth circuit accurately stated that:

9

Under the well-established law of Louisiana, the provisions of criminal statutes "shall be given a genuine construction, according to the fair import of their words, taken in their usual sense, in connection with the context, and with reference to the purpose of the provision." LSA-R.S. 14:3. Doubt concerning the extent of a criminal statute's coverage must be resolved in the accused's favor. *State v. Brown,* 378 So.2d 916 (La.1979). . . .

Cruelty to juveniles and its responsive verdicts are not listed in article 814. Therefore, pursuant to the statute and jurisprudence, a defendant charged under La.R.S. 14:93 can either be found: (1) guilty of intentional mistreatment or neglect if unjustifiable pain or suffering is caused to said child; (2) guilty of criminally negligent mistreatment or neglect if unjustifiable pain or suffering is caused to said child, and if no general criminal intent can be attributed to the defendant; or (3) not guilty. *See* [*State v.*] *Morrison*, 582 So.2d 295 [(La.App. 1 Cir. 1991)].

Earlier, and after a careful review of the record, we concluded that the state has failed to prove, beyond a reasonable doubt, that Ms. Cortez harbored the requisite specific or general criminal intent necessary to sustain a conviction of the greater offense of intentional mistreatment. Having found the evidence insufficient to prove intent on the part of Ms. Cortez to commit this crime, a conviction for an attempt, absent specific intent, cannot stand. We need not go into another prolonged analysis of intent, as it would only prove cumulative of our earlier discussions regarding the greater offense. Therefore, our "attempt" analysis must shift to the second possible crime covered in the statute, namely criminal negligence.

A serious problem arises when a defendant is convicted of attempted cruelty to a juvenile, or more specifically, attempted criminally negligent mistreatment of a juvenile, "inasmuch as an attempt is a specific intent crime and a person cannot specifically intend to do something unintentionally." *State ex rel. Elaire v. Blackburn*, 424 So.2d at 250 (La.1982). A similar problem arose in the case of *State v. Freeman*, 409 So.2d 581 (La.), *cert. denied,* 459 U.S. 845, 103 S.Ct. 100, 74 L.Ed.2d 90 (1982). In *Freeman,* a defendant argued that the trial court erred in including in the jury charges the possible verdict of "guilty of attempted cruelty to a juvenile." *Id*. at 586. The defendant based his argument, in part, on the fact that "[h]e

could not be guilty of attempted criminal neglect because there is no such crime," citing *State v. Adams*, 210 La. 782, 28 So.2d 269 (1946). *Id.* at 587. In *Adams*, 28 So.2d at 270, the Louisiana Supreme Court faced a challenge to a conviction of attempted negligent homicide; negligent homicide was defined as "the killing of a human being by criminal negligence." Pursuant to the definition of criminal negligence outlined above, the court stated:

> [I]nasmuch as criminal negligence is an essential element of the crime of negligent homicide, and inasmuch as criminal negligence cannot exist unless there is "'neither specific nor general criminal intent'"[sic] it is impossible for a person to be guilty of negligent homicide unless there is neither specific nor general criminal intent to commit the homicide.

*Id.* The court then recognized that an "attempt" applies to someone who has "*a specific intent to commit a crime.*" *Id.* In determining that a verdict of attempted negligent homicide is not responsive to an indictment for attempted murder, the *Adams* court reasoned that:

> [T]hese provisions in the Codes must be read in connection with [the] article . . . defining criminal negligence, and [the] article . . . defining "an attempt to commit the offense intended". [sic] And all of these provisions must be taken with the reservation made in . .. the Criminal Code, that "The articles of this Code cannot be extended by analogy so as to create crimes not provided for herein". [sic] *No such crime as an attempt to commit negligent homicide is provided for in the Criminal Code; and no such crime is possible under the provisions which are contained in the Code.*

*Id.* 28 So.2d at 270-71 (emphasis added).

Notwithstanding, and without directly addressing the defendant's contentions or the court's prior jurisprudence, the supreme court in *Freeman* held that "[t]he jury was properly charged with the lesser verdict of attempted cruelty to a juvenile," because it was proven that the defendant had intentionally mistreated the child. *Freeman,* 409 So.2d at 587. We need not now discuss the correctness of the supreme court's ruling in *Freeman,* or its applicability to the

11

case *sub judice*, as it is clearly distinguishable from the case at bar in one crucial aspect: No intent on the part of Ms. Cortez was proven by the state in the instant matter.

Based on our foregoing analysis, a conviction for attempted cruelty to a juvenile cannot stand for two reasons. First, the state has utterly failed to prove specific or general criminal intent on the part of Ms. Cortez necessary to sustain a conviction under the statute. A conviction based on attempted intentional mistreatment cannot stand absent a showing of general or specific criminal intent. Second, it is a legal impossibility for someone to be guilty of attempted criminal negligence. As stated above, one cannot harbor the intent to do an unintentional act. For this court to hold otherwise would defy law and logic. Accordingly, Ms. Cortez could not be convicted of attempted criminal negligence.

*Cortez*, 687 So.2d at 522-24.

Based on the same analysis as in *Cortez*, there was insufficient evidence in this case to support the conviction for attempted second degree cruelty to juveniles under the theory of intentional mistreatment or neglect; and, a conviction of criminally negligent mistreatment or neglect was a legal impossibility. Second degree cruelty to juveniles and its responsive verdicts are not listed in La.Code Crim.P. art. 814. Therefore, a defendant charged under La.R.S. 14:93.2.3 can be found: (1) guilty of intentional mistreatment or neglect if serious bodily injury is caused to the victim; (2) guilty of criminally negligent mistreatment or neglect if serious bodily injury is caused to the victim, and if no general criminal intent can be attributed to the defendant; or (3) not guilty.

Because the state failed to prove Defendant had the requisite specific or general criminal intent to sustain a conviction for the greater offense, a conviction for an attempt, absent specific intent, cannot stand. As noted in *Cortez,* "'inasmuch as an attempt is a specific intent crime and a person cannot specifically intend to do

something unintentionally.' *State ex rel. Elaire v. Blackburn*, 424 So.2d at 250 (La.1982)." *Id.* at 523.

The analysis does not, however, end at that point. We now have to examine whether cruelty to juveniles is a lesser and included offense and whether the evidence was sufficient to sustain a verdict of cruelty to juveniles.

**Cruelty to a juvenile as a lesser and included offense:**

In *State v. Teague*, 04-1132, p. 9 (La.App. 3 Cir. 2/2/05), 893 So.2d 198, 205, this court held:

> Pursuant to La.Code Crim.P. art. 821(C), an appellate court that finds "the evidence, viewed in a light most favorable to the state, supports only a conviction of a lesser included responsive offense . . . may modify the verdict and render a judgment of conviction on the lesser included responsive offense."

Louisiana jurisprudence defines "lesser and included" as "[a] lesser offense is included in the charge of the greater offense if all of the elements of the lesser crime are included in the definition of the greater offense." *State v. McCoy,* 337 So.2d 192, 196 (La.1976). "Stated in another way for practical application, this merely means that, if any reasonable state of facts can be imagined wherein the greater offense is committed without perpetration of the lesser offense, a verdict for the lesser cannot be responsive." *State v. Poe,* 38 So.2d 359, 363 (La.1948). *See also State v. Guffey*, 94-797 (La.App. 3 Cir. 2/1/95), 649 So.2d 1169, *writ denied,* 95-973 (La. 9/22/95), 660 So.2d 469.

Cruelty to juveniles is defined, in pertinent part, as "[t]he intentional or criminally negligent mistreatment or neglect by anyone seventeen years of age or older of any child under the age of seventeen whereby unjustifiable pain or suffering is caused to said child." La.R.S. 14:93(A).

13

From the reading of the two statutes, there are not circumstances wherein the acts proscribed by La.R.S. 14:93.2.3, second degree cruelty to juveniles, could be committed without committing the acts proscribed by La.R.S. 14:93, cruelty to juveniles. The term "intentional" in this case means a general criminal intent to cause a child unjustifiable pain and suffering and "mistreatment" means abuse. *State v. Porter*, 99-1722 (La.App. 3 Cir. 5/3/00), 761 So.2d 115. "Criminal negligence exists when, although neither specific nor general criminal intent is present, there is such disregard of the interest of others that the offender's conduct amounts to a gross deviation below the standard of care expected to be maintained by a reasonably careful man under like circumstances." La.R.S. 14:12; *State v. Morrison,* 582 So.2d 295, 302 (La.App. 1 Cir. 1991). The intentional or criminally negligent breaking of a bone could be defined as "serious bodily injury" and necessarily causes "unjustifiable pain and suffering." Therefore, in accordance with the facts of this case, cruelty to juveniles is a lesser and included offense of second degree cruelty to juveniles.

**Cruelty to a juvenile:**

For the same reason there was insufficient evidence to sustain a conviction for second degree cruelty to juveniles, we find there was insufficient evidence to prove that the offense of cruelty to juveniles was committed on February 2, 2007, by the Defendant.

The State charged Defendant with committing the offense during the morning hours of February 2, 2007. However, there was minimal testimony or other evidence given regarding acts committed intentionally or negligently by Defendant that would have resulted in the injury to the child's arm.

In *State v. Carlos*, 618 So.2d 933 (La.App. 1 Cir.), *writ denied,* 623 So.2d 1305 (La.1993), the accused, who was convicted of cruelty to juveniles, alleged

insufficient evidence that he was the one who beat the victim based solely on the mother's testimony that she did not commit the act, and there was no one else in the house at the time. The mother had walked into the bathroom and saw the defendant wiping blood from the victim's face. The first circuit found the evidence was sufficient, stating:

> The victim, Ms. Foret, and the defendant were alone in the trailer when these injuries were inflicted upon the victim. Ms. Foret specifically testified that she did not inflict any bruises on the victim. These injuries were definitely not self-inflicted; and there was no evidence of an intruder. The defendant did not testify at the trial. Thus, there was no plausible alternative explanation for the victim's injuries. In finding the defendant guilty of cruelty to a juvenile, the jury obviously accepted the testimony of the State's witnesses, particularly Ms. Foret. As the trier of fact, the jury was free to accept or reject, in whole or in part, the testimony of any witness. *State v. Richardson*, 459 So.2d 31, 38 (La.App. 1st Cir. 1984). Ms. Foret's credibility as a witness was a matter of the weight of the evidence, not subject to appellate review. *State v. Jones,* 596 So.2d 1360, 1370 (La.App. 1st Cir.), *writ denied,* 598 So.2d 373 (La.1992).

*Id.* at 945. Furthermore, the first circuit noted that "the defendant's argument in brief completely ignores the fact that he made an inculpatory statement to Ms. Foret shortly after the beating. When she asked why the defendant hurt the victim, he replied that 'that's what he wanted to do to [the victim's] father.'" *Id.*

This case does not turn on the victim's mother's credibility. E.L. gave no testimony regarding any injury to the baby's arm inflicted on the morning of February 2, 2007, stating only that the next morning she noticed bruises on the baby's legs. E.L. testified she said nothing to Defendant regarding any injuries. Instead, she waited until later in the day to take the baby to the hospital. It cannot be said Defendant refused to seek medical attention for the child's injured arm, thereby

causing unjustifiable pain and suffering, since there was nothing which established that he was aware of the injury.

**Count two:  Cruelty to juveniles:**

Count two of the bill of information alleged that Defendant committed a second  act of cruelty to juveniles, as follows:

> **COUNT 2:**
>
> **IN THAT HE DID ON OR ABOUT AND BETWEEN THE 8TH DAY OF JULY, 2006, AND THE 2ND DAY OF FEBRUARY, 2007**, being over the age of 17, intentionally inflict unjustifiable pain and suffering upon a child.  **D.O.B. 5/8/06**, in violation of La.R.S. 14:93[.]

As to this count, Defendant also argues that the State failed to prove beyond a reasonable doubt that he was one who inflicted the injuries on the victim. In brief, he points out that there was no testimony regarding any incident where he caused injuries between July 8, 2006, and February 2, 2007.  He also argues that the State failed to exclude the reasonable hypothesis that it was the victim's mother who inflicted the injuries.

The only evidence offered that it was Defendant who may have inflicted the injuries on the baby was E.L.'s testimony and the second-hand report by an OCS investigator who said Defendant said he dropped the baby on the way to change her. As noted above, E.L. stated that Defendant once slapped the baby's hand with a fly swatter, that he did not like her crying, and that he could not stand the crying and would "whip" her for crying.  As discussed in *Carlos*, 618 So.2d 933, the credibility of a witness is a matter of weight of the evidence, and not subject to appellate review. However, except for the brief statement above, all of E.L.'s testimony concerned solely the incident on the morning of February 2nd.  She made no mention of bruising to the child's face, redness of the baby's ears, or swollen lips. E.L. testified that she

16

asked Defendant about the bruises to the baby's legs the next morning, but she stated that he told her the baby fell over.

As for the bruises on the baby's legs, there was no testimony as to when the bruises could have been inflicted. While Doctor Nijjar described how the approximate age of a trauma to the body could be discerned from the discoloration of a bruise, he did not specifically address the age of the bruises on the victim's legs. The injury to the baby's face appeared to have been recently received. The doctor testified that "both ears were all red and swollen up. Her upper lip was swollen, and I lifted a little bit, of course very painful for the baby, there was a little wound underneath and--and slight blood started coming from there." However, the only evidence regarding injury to the baby's face was Defendant's statement to the police that the baby slipped out of his hands and hit the back of the dryer face first. There was nothing offered to indicate that the child slipping out of Defendant's hands while he was changing her was anything more than an accident. Defendant stated in his interview to the police that when he was changing the baby's diaper, she slipped out of his hands and struck her face on the back of the dryer. Defendant admitted that he spanked the children when they misbehaved. Moreover, despite the State's assertion in brief that Defendant admitted he injured the baby and hit her with a belt, in his statement to the police he never said that he hit the victim with a belt, or that he was the one who inflicted the bruises or the injury to her arm. The State argues that Defendant's statements regarding the need to discipline was tantamount to an admission that he inflicted the injuries on the baby. The State cites the following statements made by Defendant to the police to support its assertion:

> A.      And the living room right there. We don't. . .we
>         don't let him go in there when the heaters on because
>         you know what I'm saying it. . .he. . . with. . .don't
>         where he won't fall and it's you know on the heater.

17

> And he one time went over and I spanked him on his hand. What is wrong with this discipline. Would she. . .would you rather discipline your child or would you rather go would he ready to to go to go the school with a gun and shoot everybody up in there because he's getting. . . uh peoples getting picked on because. . .
>
> . . . .
>
> A.      I only use my hand and I don't spank 'em hard. I'm just trying to make them understand just don't do this.
>
> Q.      And I understand children fall and they get bruises sometimes but my question to you is you've never seen 'em bruised up from [E] beating the children or nothing have you?
>
> A.      No sir. I ain't and she doesn't. . . you know what I'm saying. . . she don't. . .she don't beat 'em neither you know what I'm saying.
>
> Q.      Okay. . .
>
> A.      We just discipline.
>
> Q.      Just like I. . .just like when. . .when she come there. I told her I said baby if you don't discipline 'em when they get older you won't be able to do nothing with 'em.

At trial, Defendant argued that the State failed to prove it was he who inflicted the injuries beyond a reasonable doubt considering that the victim's mother was continuously being monitored by Child Protection Services because of neglect of her children. Jennifer Fields testified at the trial. She was employed with the Rapides Parish Office of Community Service, Child Protection Department, at the time of the incident. She stated that as far as she was aware, there were no validated investigations of E.L. concerning physical abuse of her children. She explained that unless the complaints are validated, she could not disclose whether there had been any allegations of that sort. She stated that because two of the children were handled

18

through the Evangeline Parish Office, she had no information regarding the situation with those two children.

E.L. testified she never spanked her children. Defendant stated that he never observed E.L. abuse the children; however, he did explain he was not in the trailer very much, being an "outdoor" person. Defendant's mother testified she witnessed E.L. hit the victim with a belt and a fly swatter. She further testified that she had threatened to report E.L. to social services unless she stopped hitting the child. Defendant's father testified that he did not notice bruises on the baby the morning of the incident, but the baby was crying and that E.L. had yanked her out of the car seat by her arm. Doctor Nijjar testified that the bruises observed on the baby were very recent and up to two or three weeks old. Both doctors agreed that the new fracture to the baby's arm had occurred up to three days from the date of observation and the older fracture was up to six weeks old.

Absent internal contradiction or irreconcilable conflict with the physical evidence, a single witness's testimony, if believed by the fact finder, is sufficient to support a factual conclusion. *State v. Legrand,* 02-1462 (La. 12/3/03), 864 So.2d 89, *cert. denied,* 544 U.S. 947, 125 S.Ct. 1692 (2005). Credibility determinations are within the sound discretion of the trier of fact and will not be disturbed unless clearly contrary to the evidence. *State v. Vessell,* 450 So.2d 938 (La.1984). Therefore, we find that the evidence was sufficient to sustain the verdict of cruelty to a juvenile between July 8, 2006 and February 2, 2007.

### Excessiveness of Sentence

Louisiana Constitution Article I, § 20 prohibits the imposition of excessive punishment. A sentence is considered excessive if it is grossly disproportionate to the offense or imposes needless and purposeless pain and suffering. The trial court should consider the defendant's

19

> personal history: age, family ties, marital status, health, employment record, as well as his prior criminal record, seriousness of offense and the likelihood of rehabilitation in determining an appropriate sentence. A trial court is afforded great discretion in determining sentences and sentences within the statutory limit will not be set aside as excessive absent clear abuse of that broad discretion. In reviewing a sentence for excessiveness, the appellate court must consider the crime and the punishment in light of the harm to society and gauge whether the penalty is so disproportionate as to shock its sense of justice.

*State v. Crawford,* 05-494, p. 6 (La.App. 5 Cir. 1/31/06), 922 So.2d 666, 669 (footnotes omitted).

Further, a reviewing court should consider three factors when reviewing the trial court's sentencing discretion: 1) The nature of the crime; 2) The nature and background of the offender; and 3) The sentence imposed for similar crimes by the same court and other courts. *State v. Whatley*, 03-1275 (La.App. 3 Cir. 3/3/04), 867 So.2d 955.

An offense of cruelty to juveniles is punishable by not more than ten years, with or without hard labor. La.R.S. 14:93(D). Defendant received the maximum sentence of ten years at hard labor. In *State v. Morain*, 07-1207, p. 9 (La.App. 3 Cir. 4/2/08), 981 So.2d 66, 72, this court noted that generally maximum sentences were reserved for the most serious offenses and offenders so that there would "be some relative sense of consistency when imposing maximum sentences."

A maximum sentence in this case is excessive when compared to similarly situated offenders and the nature of the offense. In the following cases, wherein the maximum or near maximum sentences were found not to be excessive, the injuries to the victims were much more severe and deliberate. In *State Hollins*, 43,168 (La.App. 2 Cir. 4/30/08), 981 So.2d 819, the defendant pled guilty to cruelty to juveniles and received ten years imprisonment. The three-month-old victim had bite

20

marks on both arms and fractures to his upper and lower left leg, upper right arm, and left collarbone, as well as bilateral rib fractures. He also had bilateral hematomas to the brain which required emergency surgery.

In *State v. Carson,* 598 So.2d 576 (La.App. 4 Cir.), *writ denied,* 605 So.2d 1088 (La.1992), the defendant was sentenced to ten years at hard labor on one count of cruelty to juveniles. The defendant beat her ten-year-old daughter with a BB gun, a two-by-four board and a broken broom stick, cut her fingers with a knife, and burned her with cigarettes. The day the police were summoned, the offender had hit the victim in the eye, causing a tear to the lining of the eye because she could not buy cigarettes from a neighbor. An examining physician counted forty-nine wounds and scars of various age on the victim's body.

In *State v. Helsley,* 457 So.2d 707 (La.App. 2 Cir. 1984), the defendant received ten years imprisonment for a conviction of cruelty to juveniles. He beat his twelve-year-old daughter with a pipe and a pipe wrench. The pipe wrench broke during the beating. The girl disappeared the day after the beating, but her sister who observed the beating, testified as to the event at trial. The defendant had prior violent convictions, including a conviction for abuse to a child.

Finally, in *State v. Taylor,* 31,860 (La.App. 2 Cir. 2/24/99), 733 So.2d 72, the defendant received eight years at hard labor, with all but six suspended, on a conviction for cruelty to juveniles. He violently shook a two-month-old child which resulted in partial permanent paralysis, permanent impairment of vision, and neurological damage. The defendant had a prior conviction for an assault.

The following are cases wherein the sentences were found to be excessive. In *State v. Burgess,* 475 So.2d 35 (La.App. 2 Cir. 1985), the defendant was sentenced to ten years on a conviction for cruelty to juveniles. The second circuit

found the sentence to be excessive. The defendant had placed his two-year-old son in a tub of scalding water and held him there as a punishment, causing second degree burns over twenty percent of his body. He then refused to seek medical attention for the boy for three days. Moreover, at the time the boy was taken to the hospital, there were numerous bruises found on his upper body. Finding mitigating factors such as the defendant's stress level at the time, and the fact that he had been a law-abiding citizen, the second circuit stated that "it does not appear that the defendant contemplated that his conduct would cause or threaten serious harm." The second circuit went on to state:

> An examination of other reported cases in which defendants were convicted of the same crime reflects that this defendant is not among the most egregious or blameworthy of offenders. In *State v. Scott,* 400 So.2d 627 (La.1981), the child, age 2, was severely burned over 50% of his body with hot grease. The injury was accidental; however, the defendant neglected to seek medical assistance allegedly because of poverty and lack of transportation. Friends of the family and several state officials sought to bring the child into the hospital but were continually rebuffed by the defendant. It was not until four days after the injury that the child was taken to the hospital where he died as a result of the burns. The defendant received a sentence of 5 years at hard labor.

> In *State v. Freeman,* 409 So.2d 581 (La.1982), defendants Leroy Freeman and Geraldine Miles were charged with cruelty to their 17 month old boy. The facts of that case reflect that the couple abused the child on numerous occasions. The evidence of physical abuse included bruises, lacerations, choking marks on the neck, lesions consistent with human bites, cigarette burns, and fracture of one forearm. The wrists and arms were swollen, tender, and in need of treatment. The fracture was approximately a week old and some injuries were not more than two days old; other wounds had become infected and left scars. In this case the jury found Leroy Freeman guilty of attempted cruelty to a juvenile and Geraldine Miles guilty as charged of cruelty to a juvenile. The trial court found both defendants equally culpable and sentenced both defendants to five years at hard labor.

While the defendant's crime in the present case was serious, the defendant's actions did not reach the heinous proportions of *State v. Scott* and *State v. Freeman*. After considering the sentencing guidelines of Art. 894.1, we conclude that the sentence imposed by the trial court is unconstitutionally excessive in violation of Art. 1 Sec. 20 of the Louisiana Constitution of 1974. The sentence imposed is out of proportion to the severity of the offense, the defendant is not among the most egregious or blameworthy of offenders, and the length of the sentence amounts to a needless and purposeless imposition of pain and suffering. While we find that the sentence imposed by the trial court is excessive, we do not hold that the seriousness of the present crime does not justify incarceration nor do we hold that the seriousness of a crime can never alone justify an extended period of incarceration. We hold that in the present case the seriousness of the offense does not justify a maximum sentence of incarceration when balanced with the other remaining factors of Art. 894.1 which tend to mitigate in the defendant's favor. Any sentence beyond the mid-range of the possible sentence would be excessive in this case.

*State v. Burgess*, 475 So.2d at 39.

In *State v. Swan,* 544 So.2d 1204 (La.App. 1 Cir. 1989), the defendant received two concurrent terms of ten years on two counts of cruelty to juveniles, along with several other sentences for offenses stemming from a single incident. The two victims testified that the defendant beat them up. There was no testimony as to the extent of the beating and whether any significant injury resulted. The first circuit concluded without much discussion that, because the defendant has no prior criminal history, the sentences were excessive.

Finally, the following are cases wherein the sentences were in the mid-range and found not to be excessive. In *State v. Stevens,* 532 So.2d 197 (La.App. 3 Cir. 1988), *writ denied*, 541 So.2d 852 (La.1989), the defendant received two concurrent five year terms of imprisonment on two counts of cruelty to a juvenile. The defendant placed his three and one-half-year-old girl in hot water for fifteen to thirty seconds for soiling herself. He then did not allow her to receive medical attention for

four days. He initially lied about the cause of the injury, but after a lie-detector test, he admitted he did it on purpose. In *State v. Ernest*, 97-335 (La.App. 1 Cir. 2/20/98), 710 So.2d 814, *writ denied*, 98-771 (La. 7/2/98), 724 So.2d 206, the court found that a sentence of four years imprisonment at hard labor for cruelty to juveniles was not excessive where the defendant forcibly jammed a bottle into the infant's mouth, resulting in a cut lip, slammed the infant down on a changing table, and shook the infant, which could have killed him. In *State v. Panepinto,* 548 So.2d 34 (La.App. 5 Cir.), *writ denied*, 551 So.2d 1335 (La.1989), the court found a sentence of eighteen months was not excessive for a conviction of cruelty to juveniles where the eighteen-month-old suffered bruises to the head, neck and legs and a human bite on the leg; *State v. Merritt*, 03-946 (La.App. 3 Cir. 10/13/04), 884 So.2d 1283. The defendant was convicted of four counts of cruelty to juveniles. For breaking the three-year-old girl's arm and leg, he received two seven-year sentences. For deliberately holding open her eyelids and spraying hair spray into her eyes, he received a four year sentence and for prolonging her pain and suffering by refusing to allow her to receive medical attention for her broken arm, he received two years at hard labor.

After comparing the severity of the injuries inflicted on the victims in the above cases to the facts and circumstances of this case, we find that the maximum sentence amounts to a needless and purposeless imposition of pain and suffering. The seriousness of the offense does not justify the maximum sentence in this case.

Testimony established that there was a prior injury to the victim's arm and that the victim was undoubtedly battered. However, the legislature has seen fit to limit the incarceration penalty to a maximum of ten years at hard labor, and Defendant was sentenced to the maximum sentence. As noted, maximum sentences are reserved for the most egregious offenders. Compared to the above cases,

24

Defendant is not one of the most blameworthy offenders. He is a first-time felony offender.

## CONCLUSION

### Count 1:

The evidence was insufficient to sustain the verdict of either attempted second degree cruelty to a juvenile or cruelty to a juvenile. We, therefore, reverse the Defendant's conviction for attempted second degree cruelty to a juvenile, vacate and set aside his ten-year sentence, and enter a judgment of acquittal.

### Count 2:

We find that the evidence was sufficient to sustain a conviction for cruelty to a juvenile between July 8, 2006 and February 2, 2007. We further find that the sentence of ten years at hard labor is excessive. We, therefore, vacate the sentence and remand to the trial court for resentencing.

**CONVICTION AND SENTENCE FOR ATTEMPTED SECOND DEGREE CRUELTY TO A JUVENILE REVERSED AND SET ASIDE. JUDGMENT OF ACQUITTAL ENTERED.**

**CONVICTION FOR CRUELTY TO A JUVENILE AFFIRMED. SENTENCE VACATED. REMANDED FOR RESENTENCING.**

NUMBER 09-110

COURT OF APPEAL, THIRD CIRCUIT

STATE OF LOUISIANA

STATE OF LOUISIANA

VERSUS

ALTON LANE STROTHER

AMY, J., concurring in part and dissenting in part.

I concur in the affirmation of the defendant's conviction for cruelty to a juvenile. In all other respects, however, I respectfully dissent from the majority opinion as I find that an affirmation in full is required.

In my opinion, the record supports the jury's decision to convict the defendant on Count One, attempted second degree cruelty to a juvenile. The child's mother, E.L., testified regarding the early morning hours of February 2nd. She explained that the child, B., began crying and that, when she attempted to see about the child, the defendant told her "no, don't get up." She explained that her children were "very, very spoiled to [her], and [the defendant] didn't like the idea that [her] kids were spoiled." She stated that the defendant then "grabbed [B.] and brought her into the hallway to change her." She described hearing "a boom boom" while the child was with the defendant, but was told that the child fell onto the washer or dryer while being changed. She explained that, upon the defendant's return, he was going to strike the crying child with a belt, but that after she told him not to "hit [her] daughter with the belt[,]" he hit her instead. I believe that the jury could have found this testimony to be evidence of the defendant's rage and concluded that the abuse was occurring at the time of the loud noise and while out of E.L.'s sight.

Also, in his statement to police, the defendant stated that the eight-month-old child jumped from his hands during the diaper change. In my opinion, the jury could

have found this inconsistent with the degree of bruising and injury, including a fractured arm, discovered at the hospital. While the defendant contends that the State failed to exclude the hypothesis that the mother was responsible for the injuries, the jury heard the mother's account of the evening. In particular, the jury was aware that the mother took the child to the hospital the following day and that she did so only after the defendant left the house. She expressed fear of the defendant and did not seek assistance from the defendant's mother, who lived nearby. Instead, she sought help from a neighbor. All of these factors, I believe, were valid considerations for the jury in assessing credibility. I would not disturb that determination on appeal.

Finally, and although I agree with the majority that the conviction for cruelty to a juvenile is supported by the record, I respectfully disagree that the ten-year sentence imposed is excessive. I find that the child's age as well as the serious and repetitive nature of the abuse supports the sentence selected by the trial court.

For these reasons, I would affirm the defendant's convictions and sentences in full.