# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## 09-1410

STATE OF LOUISIANA

VERSUS

R.R.

************

APPEAL FROM THE
TWELFTH JUDICIAL DISTRICT COURT
PARISH OF AVOYELLES, NO. 147,684
HONORABLE WILLIAM J. BENNETT, DISTRICT JUDGE

************

## JIMMIE C. PETERS
## JUDGE

************

Court composed of Jimmie C. Peters, Marc T. Amy, and J. David Painter, Judges.

**AFFIRMED.**

Miche' Moreau
Assistant District Attorney for Division B
Twelfth Judicial District
P. O. Box 608
Marksville, LA 71351
(318) 253-4551
COUNSEL FOR APPELLEE:
    State of Louisiana

G. Paul Marx
Louisiana Appellate Project
P. O. Box 82389
Lafayette, LA 70598
(337) 237-2537
COUNSEL FOR DEFENDANT/APPELLATE:
    R.R.

PETERS, J.

The defendant, R.R.,[1] appeals from his conviction of the offense of aggravated rape, a violation of La.R.S. 14:42. For the following reasons, we affirm the conviction and sentence in all respects.

## DISCUSSION OF THE RECORD

The State of Louisiana charged the defendant by grand jury indictment with having raped J.J., the defendant's niece, who was nine years old at the time of the offense. The state charged that the offense occurred on or about April 9, 2008, and the direct evidence against the defendant came from the testimony of the victim and her twelve-year-old sister, E.J.

J.J. testified that she, E.J., and her infant brother (D.J.) were home alone when the offense occurred. According to J.J., the defendant was babysitting the three children and had gone into her parents' bedroom to watch a movie "that little kids like [her] aren't supposed to see." At the defendant's instruction, J.J. retrieved the movie and placed it in the playback machine. Thereafter, according to J.J., she, her sister, and the defendant began to watch the movie. J.J. testified that at some time after the movie began, the defendant "took out his privacy part" and instructed J.J. to touch and rub it.[2] As they continued to watch the movie and as J.J. followed the defendant's instructions, he told her to place his "privacy part" in her mouth. J.J. testified that she refused to follow this instruction.

Next, according to J.J., the defendant instructed her to remove her pants. When she refused, the defendant removed both her pants and underwear. J.J. testified that

_____

[1]Initials are used throughout the opinion to protect the identity of the victim as required by La.R.S. 46:1844(W).

[2]J.J. identified the defendant's "privacy part" as being located in his groin area.

after he removed her clothing, the defendant rubbed her "privacy part,"[3] first with his fingers and hand, and then with his tongue. According to J.J., the defendant touched the "inner part" of her "privacy part" with both his finger and tongue.

J.J. testified that the defendant's actions made her very uncomfortable and she told him that he was "not supposed to do it to a little child like [her]." She told him to stop and tried to push him away, but he overpowered her. According to J.J., the defendant "told [her] that it's going to happen to [her] whenever [she] grow[s] older" and that "he was just telling [her] and teaching [her] life." The defendant told her that if she told anyone of his actions, he would tell her mother "that [she] was cursing and stuff to make [her] get in trouble."

E.J. testified that the defendant often babysat them when their parents went to the casino.[4] She supported J.J.'s testimony that the defendant instructed her to start a movie "of a girl and a man doing the nasty stuff," and that the defendant pulled J.J.'s pants down and "licked her down there and pulled out his privacy part and tried to make her feel on it." She testified that J.J. screamed and cried and that she (E.J.) tried to make the defendant stop, but he would not listen to her. While she asserted that she saw the defendant stick his tongue inside of J.J., she did not see him insert anything else.

According to E.J., she told her teacher about the incident the next day at school. Specifically, she stated that "I didn't encourage [J.J.] to tell the story, I told the story myself." E.J.'s teacher related the information to the school principal who reported the matter to the appropriate authorities. Shortly thereafter, according to E.J., a man

---

[3]J.J. identified her own "privacy part" as being located in her groin area.

[4]E.J. is actually J.J.'s sister's child but J.J.'s parents were in the process of adopting her when the offense occurred. Both J.J.'s mother and E.J.'s natural mother are the defendant's sisters.

came to the school to talk to J.J., and J.J. was removed from the home and remained in a foster home for the summer.

The man who came to the school was Jerry Clearly, an employee of the State of Louisiana Department of Social Services. On April 10, 2008, he responded to a report from the school that children had reported an incident of molestation. Mr. Clearly testified that he interviewed both J.J. and E.J. at the school and that J.J. told him that her uncle had taken out "the thing in the middle of man's pants," and had asked her to "hold it and tried to push her face down on it." According to Mr. Clearly, J.J. told him that the defendant asked her "if he could feel on her private part and she said no but he did it anyway." J.J. related to him that she tried to push the defendant away, but he "touched her with his hand between her legs and he was trying to lick her." She also told Mr. Clearly that the defendant had been drinking and that he was showing her "her life."

The two children were referred to the Rapides Children's Advocacy Center where Connie Zeagler, the program director, interviewed both girls on April 11, 2008. These interviews were videotaped, and the videotapes were introduced at trial.

Dr. Bryan Elkins, a board-certified family medicine physician from Alexandria, Louisiana, examined J.J. on April 11, 2008. Based on his physical examination, he found nothing abnormal about J.J.'s physical appearance. However, he noted that she "complained of pain with even the lightest of touch to her genital area." He testified that he had never encountered any other child who responded in such a manner and found J.J.'s response to be "highly unusual." Dr. Elkins summarized his findings by stating that "the limited visual findings were normal, but that the behavior response

3

and complaint of pain was abnormal." Although he could not comment as to J.J.'s truthfulness, her complaints were of concern to the doctor.

In his testimony, the defendant did not deny that he had been in the presence of the children on the evening of April 9, 2008. He testified that after taking care of some personal matters that morning, he was dropped off at his sister's house, borrowed some of his brother-in-law's clothes, and mowed the yard. Both J.J. and E.J. arrived home from school just as he completed mowing the yard. He then borrowed his sister's vehicle and he and the two girls ran some errands. According to the defendant, when they returned to his sister's house, she informed him that she and her husband were leaving and would be back in a few minutes. His sister told him he could stay until their return.

The defendant testified that after the parents left, he took a bath and changed back into his own clothes. As he walked past the bedroom door toward the kitchen area, he heard his name called. He testified that he went to the bedroom door and saw both E.J. and J.J. in the room. According to the defendant, E.J. had a television remote control in her hand and J.J. was sitting on the bed. When he glanced at the television, he saw "a man standing up behind a woman, naked." He testified that he never went into the room. Instead, he went to the front of the house and when E.J. and J.J. exited the bedroom, he told them, "you guys know ya'll wrong for what ya'll just got through doing." He told them they would be in trouble if he told their parents.

According to the defendant, the whole scene "got [him] stressed out" and he took a walk around the neighborhood. About one and one-half hours later, he

4

returned to find that his sister had returned. He testified that he spent the night on the sofa at his sister's home and never told the girls' mother what he had witnessed.

Thirteen days later he was arrested. He asserted in his testimony that his arrest was the first time he became aware he was being accused of anything. He maintained his innocence throughout his testimony.

The defendant elected a bench trial rather than to be tried by a jury, and upon completion of the evidentiary phase, the trial court found the defendant guilty as charged. Thereafter, the trial court sentenced the defendant to life imprisonment at hard labor without the benefit of parole, probation, or suspension of sentence. The defendant perfected this appeal, asserting three assignments of error.

**OPINION**

In one of his assignments of error, the defendant asserts that the evidence was insufficient to convict him of the offense of aggravated rape. Specifically, he argues that the evidence establishes contradictory versions of the offense, that the children were confused with the pornography they were watching, and that their confusion caused them to describe events which did not occur.

As it applies to the matter before us, aggravated rape is defined as "a rape committed upon a person . . .where the . . . oral . . . sexual intercourse is deemed to be without the lawful consent of the victim because it is committed . . . [w]hen the victim is under the age of thirteen years." La.R.S. 14:42(A)(4). As applied to the matter before us, La.R.S. 14:41(C)(1) defines oral sexual intercourse as "[t]he touching of the anus or genitals of the victim by the offender using the mouth or tongue of the offender."

It is well settled that the standard of review in a sufficiency of the evidence claim is "whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found proof beyond a reasonable doubt of each of the essential elements of the crime charged." *State v. Leger*, 05-11, p. 91 (La. 7/10/06), 936 So.2d 108, 170, *cert. denied*, 549 U.S. 1221, 127 S.Ct. 1279 (2007) (citing *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781 (1979); *State v. Captville*, 448 So.2d 676, 678 (La.1984)). In fact, this standard of review is now legislatively embodied in La.Code Crim.P. art. 821. It does not allow the appellate court "to substitute its own appreciation of the evidence for that of the fact-finder." *State v. Pigford*, 05-477, p. 6 (La. 2/22/06), 922 So.2d 517, 521; *State v. Robertson*, 96-1048 (La. 10/4/96), 680 So.2d 1165. That is to say, the appellate court's function is not to assess the credibility of witnesses or reweigh the evidence. *State v. Smith*, 94-3116 (La. 10/16/95), 661 So.2d 442. The factfinder's role is to weigh the credibility of witnesses. *State v. Lambert*, 97-64 (La.App. 3 Cir. 9/30/98), 720 So.2d 724. Other than insuring the sufficiency evaluation standard of *Jackson*, "the appellate court should not second-guess the credibility determination of the trier of fact," but rather, it should defer to the rational credibility and evidentiary determinations of the jury. *Id.* at 727; *State v. Turner*, 04-1250 (La.App. 3 Cir. 3/2/05), 896 So.2d 286, *writ denied*, 05-871 (La. 12/12/05), 917 So.2d 1084. Indeed, a witness's credibility is "a matter of the weight of the evidence, not subject to appellate review." *State v. Strother*, 09-110, p. 15 (La.App. 3 Cir. 10/7/09), 19 So.3d 598, 607-08.

It is undisputed that J.J. was under the age of thirteen at the time of the offense. Additionally, the testimony of both J.J. and E.J., if believed, clearly establishes beyond a reasonable doubt that the defendant intentionally touched J.J.'s genitals with

6

his tongue. In finding these facts to be proven beyond a reasonable doubt, the trial court stated the following with regards to J.J.'s credibility:

> Am I firmly convinced of the truth of the charge that [J.J.] brought here today, that she gave in her tape to the advocacy center and that she's said consistently. And the answer to that is a resounding yes. This young lady was telling the truth.

Additionally, the trial court recognized that while E.J. "has had some problems in her life" those problems had nothing to do with the defendant. The trial court concluded that E.J.'s statements were consistent and that she had no motive to lie about the defendant. In other words, the trial court found her to be credible as well.

Applying the *Jackson* standard to the facts before us and specifically considering the trial court's credibility determination with regard to J.J.'s testimony, we do not second-guess that assessment. That being the case, despite the fact that some evidence supports the defendant's argument,[5] we find no merit in this assignment of error.

In another assignment of error, the defendant argues that the trial court erred in admitting into evidence Ms. Zeagler's videotaped interview with E.J. He asserts that it should have not been admitted because it is an interview with a victim of a separate offense and that E.J.'s involvement in this prosecution should have been limited to her live testimony. We agree that the trial court erred in admitting E.J.'s statement, but find that this was harmless error.

---

[5]E.J. testified that she and J.J. had watched the pornographic videotapes in the past and that both girls were aware where the tapes were stored. Additionally, she testified that she did not like the way J.J.'s mother treated them. Also, E.J. testified that J.J. had slipped on a bicycle not long before the offense and had injured her "private parts"—a statement which, if true, would explain Dr. Elkins' findings. However, the record also contains evidence concerning E.J.'s credibility. Both J.J. and J.J.'s father testified that E.J. was prone to making false statements. Not only had she asserted claims of sexual abuse while living in foster homes, but she had also alleged that J.J.'s father (who is also her adoptive father) had molested her.

The state relies on that portion of Title 15 (La.R.S. 15:440.1 *et. seq*.), which sets forth the parameters under which the electronic recordings of protected persons may be admitted into evidence. In support of its admissibility argument, the state directs the court to La.R.S. 15:440.3 which provides that a videotape of a protected person is "admissible in evidence as an exception to the hearsay rule."

While we agree that E.J. is a "protected person" as defined in La.R.S. 15:440.2(C),[6] we do not find that the state complied with the procedure set forth for the statement's admissibility. Specifically, La.R.S. 15:440.2 provides that the videotape must be authorized by the trial court having original jurisdiction or the coroner in certain cases. The record contains no evidence that either the trial court or the coroner authorized the videotaped statement at issue. Therefore, the trial court erred in admitting E.J.'s videotaped statement.

The fact that the trial court erred in admitting E.J.'s videotaped statement does not end our inquiry. The defendant has pointed to nothing that would suggest he was prejudiced by the videotape's introduction, and we have carefully reviewed the videotape and find that its admission into evidence constitutes harmless error.[7]

Finally, the defendant asserts that the trial court erroneously concluded that it was without authority to depart from the mandatory statutory penalty of life imprisonment at hard labor without the benefit of probation, parole, or suspension of

_____

[6]As it pertains to this matter, the statute defines a protected person as any person under the age of seventeen "who is a victim of a crime *or a witness in a criminal proceeding*." La.R.S. 15:440.2(C) (emphasis added).

[7]The defendant complains that the repetitive, cumulative, and prejudicial nature of the videotape added to the credibility of E.J. "because the jury heard the same story over and over again from different sources." However, we note that this was not a jury trial and the defendant points to no evidence that the trial court was unduly influenced by the videotape.

8

sentence. The defendant argues that Louisiana's constitution allows the trial court to fashion a sentence in an exceptional case such as this.

The matter of the severity of the offense versus the mandatory penalty apparently arose during closing arguments.[8] Immediately after closing arguments, the trial court made the comment that during closing argument, its reference to the difference between the various offenses requiring a mandatory life imprisonment sentence should not be taken as a statement minimalizing the offense committed by the defendant. The trial court went on to describe the offense as "a terrible crime."

At the hearing of the motion for post-verdict judgment of acquittal, the defendant's counsel argued that he did "not believe that it was the legislature's intent for these type of facts to warrant a life sentence," and he prayed for "a post-judgment verdict of acquittal" or alternatively, for a new trial. In response to this argument, the state simply pointed out that the supreme court has consistently upheld the mandatory sentence of La.R.S. 14:42.

The trial court also responded. Apparently referring to its prior statements, the trial court noted that it had found all of the elements of La.R.S. 14:42 proven and that "the hesitation I had was because of the severity of the penalty, which was a mandatory [sentence]." Specifically, the trial court stated that when compared to other violent crimes which receive lesser penalties, "the punishment didn't fit the crime."

The trial court expressed a similar concern with regard to the sentence at the sentencing hearing:

> I found you guilty of the charge of Aggravated Rape, I do believe in this
> case that the punishment does not necessarily fit the crime that the

[8]Closing arguments were not transcribed.

9

evidence confirmed, however I have to follow the law as it is written currently and I am sure that appeals will ensue. And however but based on the law that says whoever commits the crime of Aggravated Rape shall be punished by life imprisonment at hard labor without benefit of probation, parole or suspension of sentence, that is the sentence that is being imposed by the court.

We agree with the defendant that the supreme court has recognized situations where deviation from a mandatory sentence is allowed. In *State v. Dorthey*, 623 So.2d 1276, 1280-81 (La.1993) (footnote omitted), the supreme court noted in the context of a habitual offender proceedings:

> If, in this case when defendant is ultimately sentenced, the trial judge were to find that the punishment mandated by R.S. 15:529.1 makes no 'measurable contribution to acceptable goals of punishment' or that the sentence amounted to nothing more than 'the purposeful imposition of pain and suffering' and is 'grossly out of proportion to the severity of the crime,' he has the option, indeed the duty, to reduce such sentence to one that would not be constitutionally excessive."

In *State v. Johnson*, 97-1906 (La. 3/4/98), 709 So.2d 672, the trial court deviated from the habitual offender sentencing provisions and sentenced a fourth felony offender to thirty months at hard labor instead of the mandatory twenty years. The supreme court began its analysis by noting that "[t]he Legislature has sole authority under the Louisiana Constitution to define conduct as criminal and provide penalties for such conduct" and that sentences provided for by the legislature are "presumed to be constitutional." *Id.* at 675. The supreme court went on to note that "[o]n the other hand, the judiciary has the authority, *in the rare case*, to declare a sentence within these statutory limits excessive *under the facts of a particular case.*" *Id.* at 676 (emphasis added). It concluded that:

> [T]o rebut the presumption that the mandatory minimum sentence is constitutional, the defendant must clearly and convincingly show that:
>
> > [he] is exceptional, which in this context means that because of unusual circumstances this defendant is a victim

10

> of the legislature's failure to assign sentences that are meaningfully tailored to the culpability of the offender, the gravity of the offense, and the circumstances of the case.
>
> [*State v.] Young*, 94-1636 at pp. 5-6 [(La.App. 4 Cir. 10/26/95),] 663 So.2d [525,] 528 (Plotkin, J., concurring).

*Id.*

The supreme court expanded this holding to all sentences in *State v. Fobbs*, 99-1024 (La. 9/24/99), 744 So.2d 1274.

We do not find that the defendant is entitled to relief in the case before us. The trial court did not find that the defendant's situation was exceptional. Instead, the trial court simply expressed its disagreement with the legislature's inclusion of oral sexual intercourse as defined in La.R.S. 14:41(C) as an aggravated rape under La.R.S. 14:42. In fact, one of the defendant's basic arguments at the hearing on his post-verdict judgment of acquittal was that the trial court should grant a new trial and find the defendant guilty of a lesser and included offense to avoid the harshness of the penalty under La.R.S. 14:42.

Given that the trial court's comments related to its disagreement with the statute in general and not how it may apply to the particular defendant to be sentenced, we do not find that the trial court considered deviation to be inappropriate in this case. Instead, the trial court concluded that it had no authority to deviate from the mandatory minimum sentence absent any exceptional circumstances. Therefore, we find no merit in this assignment or error.

## ERRORS PATENT

Louisiana Code of Criminal Procedure Article 920(2) requires that we review all appeals for errors "discoverable by a mere inspection of the pleadings and

proceedings and without inspection of the evidence." After reviewing the record, we find no such errors.

## DISPOSITION

For the foregoing reasons, we affirm the defendant's conviction and sentence in all respects.

**AFFIRMED.**