STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT

KA 09-1487


STATE OF LOUISIANA

VERSUS

ERIC L. HUNTER


**********

APPEAL FROM THE
TENTH JUDICIAL DISTRICT COURT
PARISH OF NATCHITOCHES, NO. C12459-1
HONORABLE DEE A. HAWTHORNE, DISTRICT JUDGE

**********

**BILLY HOWARD EZELL**
**JUDGE**

**********

Court composed of Sylvia R. Cooks, Billy Howard Ezell, and J. David Painter, Judges.

**CONVICTION VACATED; SENTENCE SET ASIDE.**

**Van Hardin Kyzar**
**District Attorney, Tenth Judicial District Court**
**P. O. Box 838**
**Natchitoches, LA 71458-0838**
**(318) 357-2214**
**Counsel for Plaintiff/Appellee:**
**State of Louisiana**

**Billy Joseph Harrington**
**Assistant District Attorney**
**P.O. Box 838**
**Natchitoches, LA 71458-0838**
**(318) 357-2214**
**Counsel for Plaintiff/Appellee:**
**State of Louisiana**

**Alex J. Washington**
**Washington & Wells**
**1657 Benton Road**
**Bossier City, LA 71111**
**(318) 841-1233**
**Counsel for Defendant/Appellant:**
**Eric L. Hunter**

**EZELL, JUDGE.**

The Defendant, Eric L. Hunter, was charged by bill of information filed on April 25, 2007, with possession with intent to distribute crack cocaine, in violation of La.R.S. 40:967. On May 2, 2007, the Defendant entered a plea of not guilty. The Defendant subsequently proceeded to trial and, on August 5, 2008, was found guilty as charged. The Defendant was sentenced on December 10, 2008, to serve twenty years at hard labor, with the first two years of the sentence to be served without benefit of probation, parole, or suspension of sentence.

A motion for out-of-time appeal and designation of record was filed on August 6, 2009. The motion was subsequently granted. The Defendant is now before this court asserting two assignments of error. Therein, the Defendant contends the evidence was insufficient to convict him and the trial court abused its discretion in failing to swear in the jury prior to the beginning of trial. We find the evidence to be insufficient to support the Defendant's conviction.

## FACTS

A vehicle, in which the Defendant was a passenger, was stopped by police in front of James Vertner's home. The Defendant and another passenger, Michael Paige, entered the home. Police followed them into the home and obtained permission to search. Police found a bag containing forty rocks of crack cocaine under a chair in which Paige had been sitting. The Defendant was arrested and subsequently convicted of possession with intent to distribute crack cocaine.

## _____ASSIGNMENT OF ERROR NUMBER ONE

In his first assignment of error, the Defendant contends that the evidence was insufficient to convict him of possession with intent to distribute crack cocaine.

> When the issue of sufficiency of evidence is raised
> on appeal, the critical inquiry of the reviewing court is

1

whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 [*rehearing denied*, 444 U.S. 890, 100 S.Ct. 195, 62 L.Ed.2d 126] (1979); *State ex rel. Graffagnino v. King*, 436 So.2d 559 (La.1983); *State v. Duncan*, 420 So.2d 1105 (La.1982); *State v. Moody*, 393 So.2d 1212 (La.1981). The role of the factfinder is to weigh the respective credibility of each witness. Therefore, the appellate court should not second guess the credibility determinations of the factfinder beyond the sufficiency evaluations under the *Jackson* standard of review. *See State ex rel. Graffagnino*, 436 So.2d 559, citing *State v. Richardson*, 425 So.2d 1228 (La.1983).

*State v. Miller*, 98-1873, p. 5 (La.App. 3 Cir. 10/13/99), 746 So.2d 118, 120, *writ denied*, 99-3259 (La.5/5/00), 761 So.2d 541. Additionally, in *State v. Ortiz*, 96-1609, p. 12 (La.10/21/97), 701 So.2d 922, 930, *cert. denied*, 524 U.S. 943, 118 S.Ct. 2352, 141 L.Ed.2d 722 (1998), the Louisiana Supreme Court stated:

When circumstantial evidence is used to prove the commission of the offense, La.R.S. 15:438 requires that "assuming every fact to be proved that the evidence tends to prove, in order to convict, it must exclude every reasonable hypothesis of innocence." This is not a separate test to be applied when circumstantial evidence forms the basis of a conviction; all evidence, both direct and circumstantial must be sufficient to satisfy a rational juror that the defendant is guilty beyond a reasonable doubt. *State v. Porretto*, 468 So.2d 1142 (La.1985).

*State v. Strother*, 09-110, pp. 1-2 (La.App. 3 Cir. 10/7/09), 19 So.3d 598, 600 (alteration in original).

The Defendant was convicted of possession with intent to distribute CDS Schedule II, cocaine. The State was required to prove beyond a reasonable doubt that the Defendant intentionally possessed cocaine and that he had the specific intent to distribute the cocaine. La.R.S. 40:967(A)(1). The State was also required to prove guilty knowledge, "*i.e.*, . . . that an accused is aware of the illegal drugs in his possession." *State v. Davis*, 05-543, p. 8 (La.App. 3 Cir. 12/30/05), 918 So.2d 1186, 1192, *writ denied*, 06-587 (La.10/13/06), 939 So.2d 372. "However, since knowledge is a state of mind, it need not be proven as fact, but rather may be inferred from the circumstances." *State v. Major*, 03-3522, p. 8 (La.12/1/04), 888 So.2d 798, 803 (citation omitted).

*State v. McGinnis*, 07-1419, p. 13 (La.App. 3 Cir. 4/30/08), 981 So.2d 881, 892.

2

"Possession of narcotic drugs can be established by actual physical possession or by constructive possession." *State v. Hongo*, 06-829, p. 4 (La.App. 3 Cir. 12/6/06), 944 So.2d 856, 859 (quoting *State v. Davis*, 05-543, p. 5 (La.App. 3 Cir. 12/30/05), 918 So.2d 1186, 1190, *writ denied*, 06-587 (La.10/13/06), 939 So.2d 372).

The supreme court in *State v. Toups*, 01-1875, pp. 3-4 (La.10/15/02), 833 So.2d 910, 913, summarized the law on constructive possession as follows:

> A person may be in constructive possession of a drug even though it is not in his physical custody, if it is subject to his dominion and control. Also, a person may be deemed to be in joint possession of a drug which is in the physical custody of a companion, if he willfully and knowingly shares with the other the right to control it. . . .
>
> *State v. Trahan*, 425 So.2d 1222 (La.1983) (citing *State v. Smith*, 257 La. 1109, 245 So.2d 327, 329 (1971)). However, it is well settled that the mere presence in an area where drugs are located or the mere association with one possessing drugs does not constitute constructive possession. *State v. Harris*, 94-0970 (La.12/8/94), 647 So.2d 337; *State v. Bell*, 566 So.2d 959 (La.1990).
>
> A determination of whether there is "possession" sufficient to convict depends on the peculiar facts of each case. Factors to be considered in determining whether a defendant exercised dominion and control sufficient to constitute constructive possession include his knowledge that drugs were in the area, his relationship with the person found to be in actual possession, his access to the area where the drugs were found, evidence of recent drug use, and his physical proximity to the drugs. *State v. Hughes*, 587 So.2d 31, 43 (La.App. 2 Cir.1991), *writ denied*, 590 So.2d 1197 (La.1992); see also *Bujol v. Cain*, 713 F.2d 112 (5 Cir.1983), *cert. denied*, 464 U.S. 1049, 104 S.Ct. 726, 79 L.Ed.2d 187 (1984) (listing above factors as well as a sixth factor: "evidence that the area was frequented by drug users").

> *State v. Jacobs*, 08-1068, pp. 3-4 (La.App. 3 Cir. 3/4/09), 6 So.3d 315,
> 318 [writ denied, 09-755, (La. 12/18/09), 23 So2d 931] (alteration in
> original).

*State v. Johnlouis*, 09-235, pp. 8-9 (La.App. 3 Cir. 11/4/09), 22 So.3d 1150, 1156-57.

"[P]roximity to the drug may establish a prima facie case of possession when colored

by other evidence." *State v. Thompson*, 09-128, p. 8 (La.App. 5 Cir. 9/29/09), 22

So.3d 1105, 1110 (*citing State v. Jones*, 04-1258, p. 7 (La.App. 5 Cir. 4/26/05), 902

So2d 426).

> Guilty knowledge is an essential element of the crime of
> possession of cocaine. *State v. Goiner*, 410 So.2d 1085, 1086-87
> (La.1982). Although a conviction for possession of cocaine can stand
> on the possession of the slightest amount of the drug, the amount of the
> substance will have some bearing on the defendant's guilty knowledge.
> *State v. Gaines*, 96-1850, pp. 5-6, (La.App. 4 Cir. 1/29/97), 688 So.2d
> 679, 682-83, *writ denied*, 97-0510 (La.9/5/97), 700 So.2d 503; *State v.
> Spates*, 588 So.2d 398, 401 (La.App. 2 Cir.1991). In addition, the
> possession of drug paraphernalia is, because of the items' peculiar
> nature, indicative of guilty knowledge. *Gaines*, p. 6, 688 So.2d at 683;
> *Spates,* 588 So.2d at 402. Finally, flight is a circumstance from which
> guilt can be inferred. *See State v. White*, 535 So.2d 929, 933
> (La.App. 2 Cir.1988), *writ denied*, 537 So.2d 1161 (La.1989).

*State v. Smith*, 98-2645, p. 5 (La.App. 4 Cir. 1/26/00), 752 So.2d 314, 317-18.

> Intent to distribute can be inferred from the circumstances surrounding
> the arrest. *State v. Hearold*, 603 So.2d 731 (La.1992). In *Hearold*, the
> Louisiana Supreme Court explained that: "Intent is a condition of mind
> which is usually proved by evidence of circumstances from which intent
> may be inferred." *Id*. at 735. The court further listed five factors useful
> in determining whether circumstances are such that intent to distribute
> can be inferred:
>
>> 1) [W]hether the defendant ever distributed or
>> attempted to distribute the drug; 2) whether the drug was
>> in a form usually associated with possession for
>> distribution to others; 3) whether the amount of drug
>> created an inference of an intent to distribute; 4) whether
>> expert or other testimony established that the amount of
>> drug found in the defendant's possession is inconsistent
>> with personal use only; and 5) whether there was any
>> paraphernalia, such as baggies or scales, evidencing an
>> intent to distribute.
>
> *Id*.

4

*State v. Monceaux*, 04-449, p. 8 (La.App. 3 Cir. 10/20/04), 885 So.2d 670, 675, (alteration in original).

Trooper Richard Horton testified that on January 19, 2007, police were looking for a vehicle driven by Edward Paige, as there was a warrant for his arrest and a warrant to seize his vehicle for drug trafficking. Police followed the vehicle. After Edward determined police were following him, he pulled up to a house. Police turned on their lights, and two passengers exited the vehicle and ran inside the home.

Within ten seconds, Trooper Horton entered the house. Trooper Horton testified that once he entered the house, one of the people he was pursuing was sitting in a chair and the other was standing. He immediately secured the two and had them escorted out of the house. Trooper Horton testified that Michael Paige was sitting in the chair and the Defendant was standing by the chair. Trooper Horton later testified that the Defendant was sitting on a cooler next to the chair.

Trooper Horton subsequently asked the homeowner, James Vertner, for consent to search the home. Vertner agreed, and Trooper Horton found a cellophane bag containing numerous rocks of crack cocaine on the floor under the chair Michael had been sitting in. Vertner told Trooper Horton the drugs were brought in by "those boys." The Defendant was subsequently arrested.

During a search of the Defendant's person, police found $1,121.00 in his pocket. There were fifty $20 bills, one $10 bill, one $5 bill, six $1 bills, and one $100 bill. Trooper Horton was asked if he knew the Defendant from his work in narcotics, and he responded, "Yes sir doing surveillance on the organization." He further testified that Edward and Michael were involved in the organization. Trooper Horton testified that because of the denominations of money the Defendant possessed, it was determined that the Defendant worked with Michael and Edward in their drug

5

organization. Trooper Horton testified that crack cocaine is sold for twenty dollars a rock and noted the Defendant had fifty $20 bills in his possession.

Detective Roger Henson testified that he pulled up to Vertner's home immediately after the officer that stopped Edward's vehicle. Two occupants of the car ran inside the house. He ran into the house behind Trooper Horton. One of the suspects was sitting in a chair, and the Defendant was sitting on an ice chest "connected, almost touching the chair, leaning on the arm of the chair." The cooler was directly next to the chair.

The Defendant and Michael were escorted out of the home. Trooper Horton obtained consent to search, lifted the chair, and found a bag containing suspected crack cocaine. Vertner said "the boys" must have put the drugs there because he had previously cleaned under the chair.

Detective Henson testified that the bag found by Trooper Horton contained forty rocks of crack cocaine. He further testified that during an additional search of the Defendant's person, another two hundred dollars was found.

Detective Henson noted that the Defendant pled guilty to distribution of marijuana in 1993, distribution of crack cocaine in 1996, and possession of cocaine in 2006.

Officer Glen Sers testified that he stopped the vehicle driven by Edward Paige. Once the vehicle stopped, two people got out and walked quickly to a house. Officer Sers testified that other officers arrived on the scene in no more than one minute. He further testified that he entered the home to identify the people who had fled because there were several people inside the home and neither Detective Henson nor Trooper Horton were absolutely certain who had fled. Officers Sers testified that the Defendant had been secured before he entered the home.

James Vertner testified that the Defendant, along with Michael Paige, entered his home. Vertner additionally testified that when police entered his home, Michael was seated in a chair and the Defendant was in the kitchen by the sink. Vertner further testified about the Defendant's presence in his home as follows:

> Well Eric came in and he uh, stood by the kitchen sink and then he stood by the uh, ice box a minute and uh, some uh, somebody said J.T. what [are] all these uh, police is [sic] doing in your yard? So uh, he was just standing there by the ice box and then the officer came in and you know he just sit [sic] down and uh, the other guy just got up out the chair and sit [sic] on the couch and the officer said uh, uh, the last two people that came in here I want ya'll to come out.

Vertner stated that the crack cocaine found in his home was not there prior to the time the Defendant and Michael arrived. Additionally, it did not belong to him or anyone else that was present in the home prior to the arrival of Michael and the Defendant.

Vertner testified that he moved the chair and vacuumed under it approximately an hour before the crack cocaine was found. He did not see who put the crack cocaine under the chair. However, Michael was the only person who sat in the chair.

Vertner was questioned about the chair Michael sat in as follows:

Q. Now let me ask you about that recliner. When you sit in that recliner, uh, is there a hole in one side of it, that that goes down to the floor? You know a space that's, that's not all the way closed in I guess would be the way to say it?

A. Yes ma'am.

John Babers was present at Vertner's home on the night in question. Babers testified that when the Defendant and Michael entered the house, Michael sat in a chair. Further, the Defendant stood by a table, walked back toward the front door, the back to the table. Babers testified that the cooler usually sat next to the refrigerator.

7

He further testified that the cooler was located on one side of the opening to the hallway and the chair on the other side. Thus, they were two to three feet apart.

Babers indicated the Defendant did not sit on the cooler and the table was not next to the cooler. He further testified that there was a hole in the left side of the chair in which Michael sat between the arm rest and the seat and, if you put your hand between the two, you could "go completely to the floor."

Babers testified that he had been at Vertner's home for two to three hours and there were eight to twelve other people there. Babers never saw the Defendant near the sink.

Lakeisha Holden, the Defendant's fiancé, testified that a week before the Defendant was arrested, he went to the Horseshoe Casino and won approximately $1,800.00. The money consisted of mainly twenty dollar bills. She kept the money until the night before the Defendant was arrested. At that time, the Defendant wanted $1,000.00 to bring to Marvin Paige's attorney. However, the Defendant did not deliver the money because he was arrested. Holden further testified that the Defendant did not have a vehicle and did not work for anyone. However, he cut hair and mowed lawns.

Margaret Raymond, the Defendant's mother, testified that the Defendant's father died in 2003 and left him an inheritance. She further testified that the Defendant did not have a vehicle.

Michael Paige testified that he called Edward Paige to pick him up on the date in question. He was in the vehicle not more than five minutes before the vehicle was stopped by police. When the vehicle was stopped, he and the Defendant walked to Vertner's house. Michael went into the house because he had forty rocks of crack cocaine in his pocket, and the Defendant got out to avoid being arrested, as there was

8

an outstanding warrant for his arrest. He further testified that the Defendant was not aware he had the cocaine in his pocket. He stuffed the cocaine down into the back of the chair that he sat in. Michael testified that when he got out of the chair, he heard the rocks of crack cocaine hit the floor under the chair.

Michael testified that the Defendant sat at a table directly across from him. Further, the Defendant never sat on the cooler, which was located on the other side of the hallway entrance.

Michael testified that the Defendant did not loan him any money nor did the Defendant receive any money in connection with the drugs Michael possessed on the date in question. Further, Michael pled guilty regarding these events approximately one year before he testified and, at that time, he admitted the crack cocaine was his. Michael denied having sold drugs for Marvin or Edward and testified that he was not involved in their organization.

The Defendant testified that he pled guilty to his prior drug offenses and he chose to go to trial in this matter because the crack cocaine at issue was not his.

The Defendant testified that Marvin Paige called and asked to borrow $800.00 to pay his attorney. On the night in question, the Defendant got the money he won at the casino from Lakeisha. He and Edward then went to the home of Marvin's girlfriend. The two left that residence and headed to Vertner's home. However, they stopped to pick up Michael. The Defendant then testified as follows:

> We left from his aunt's house. He jumped in. We left and went straight up the street. And as I was getting out [of] the truck Edward seen the law coming from off Lake Street. And he said man here they come I guess they fixing to arrest me. So I was on my way to getting out [of] the truck and he drove off with my leg hanging out [of] the truck and pulled in J.T.'s yard. I got out and walked in the house and all of a sudden Michael come behind.
>
> . . . .

9

Michael come in behind, he sat, I stand up, I was standing by the chair, the loveseat which is across from the chair where Michael was sitting, the recliner and the table is [sic] right, right in front of me so I'm standing in between the table and the loveseat. And I walked back out to see was Edward okay, to the door to see was Edward okay then that's when I seen [sic] all those other laws coming. And I walked back to the table and I was standing there and when the man came in the door he said who's, who got out [of] the vehicle? And I sat down in the chair and then he got, then he looked at me and say [sic] you come here. And I got up, I went to the door and he handcuffed me, well they didn't handcuff me, they took everything out [of] my pocket and then just placed me in the car.

The Defendant testified that two days prior to these events, Trooper Horton pulled him over and took $900.00 from him. The Defendant further testified that Trooper Horton told him if he kept trying to get Marvin out of jail, he would end up in jail with him.

The Defendant testified that he did not know that Michael possessed drugs. Further, Michael had no connection to the money he had in his possession at the time they were arrested.

The Defendant testified that he did not have a job, but he cut hair under his carport and helped his uncle mow lawns. The Defendant denied that he ever dealt drugs.

Detective Henson testified that Marvin Paige was under investigation in relation to drug racketeering involving a large drug organization in Natchitoches Parish. Detective Henson possessed a recorded conversation between the Defendant and Marvin that occurred two weeks prior to the Defendant's arrest.

During the phone call, the Defendant told Marvin it was the first time his phone had rung. Marvin then told the Defendant to get some more phones and that Marvin's phone calls were being monitored. Marvin also told the Defendant there would be no more slipping. Further, the Defendant was not to let anyone follow him. Game faces were to be on at all times. He further stated the Defendant was not to let a

10

person drink the syrup.[1] Marvin further stated that no one was to take any chances. They must make sure their teeth are clean. Marvin additionally instructed that they were not to have too much money on them. Further, no one was to bring up anything about his phone. If it was not about his case, Marvin did not want to hear about it. The call then ended.

A female voice was heard, and Marvin instructed her to call a 609 number. There was no answer. Marvin had the female call the Defendant again. During the second call, Marvin told the Defendant not to drink syrup. Further, the Defendant was to make sure everything was straight and he was responsible for finding Pooh and both of them were to get new phones, change the numbers, and talk on those phones only. The Defendant was to tell Pooh not to drink syrup or go to the boat until Marvin got home.

Detective Henson testified that in his opinion, Marvin was giving the Defendant a directive to make sure all persons associated with Marvin got new phones because "he felt that they were listening to [sic]." Further, Detective Henson indicated that Marvin told his associates not to carry large sums of money because he did not want his associates to draw more attention to him or his organization. Additionally, he testified that do not go to the boat meant not to go to the casinos.

Detective Greg Dunn was accepted as an expert in the sale, distribution, and use of narcotics. Detective Dunn was questioned regarding the drug organization as follows:

> Q. If, if Eric Hunter were riding in a vehicle with Edward Paige and Michael Paige, and was discovered, searched later uh, ran from the vehicle and was searched later and had over $1100 dollars cash on him and uh, had been with Michael Paige and in close proximity to

---

[1]Detective Henson testified that syrup was the street name for liquid codeine or promethazine, which is a schedule narcotic.

approximately 40 rocks of crack/cocaine. What if anything would that indicate to you in your opinion?

A. Well one of the things is the, the company or the other associates that he's traveling with, namely Edward Paige who was a focus of an ongoing investigation, joint investigation between our agency, the State Police, uh, DEA, where several agencies investigating him, they were part of a large organization. Mr. Hunter, whom I've known from, from earlier years and being with that group would say that, that they [sic] moving mid to upper level quantities of drugs. Uh, the other individual, Michael is of lesser status than those two. He's not maybe so to speak a rookie but he's a lot younger and hadn't been in the game as long as the other two players have.

Detective Dunn was further questioned as follows:

Q. If I told you that Rick Horton had testified earlier that there were, the defendant had on [sic] his possession, six, $1 dollar bills, one, $5 dollar bill, one, $10 dollar bill, fifty, $20 dollar bills and one, $100 dollar bill, what would that indicate to you?

A. Okay the thing that stands out there is the fifty, $20 dollar bills. Like I indicated to you earlier when I was explaining the process, normally on street sells they [are] sold in amounts of $20.00 dollars or $40.00 dollars. Uh, him having those [sic] many $20's, uh, with the possession of some additional rock indicates to me that not only did he still have a number of rocks left, he had also sold a fairly large number of rocks prior to being confronted by the police.

Q. Would in your opinion, that indicate to you that he had sold crack/cocaine?

A. Yes it would definitely indicate that uh, he had sold crack/cocaine. He had every intent to distribute crack/cocaine because of the denominations.

Detective Dunn testified that forty rocks of crack cocaine would not be indicative of personal consumption.

POSSESSION OF CRACK COCAINE

The crack cocaine at issue was found under a chair in the home of James Vertner. Thus, the State was required to prove the Defendant had constructive possession of the cocaine. There are several factors to consider when determining

12

whether the Defendant had constructive possession of the crack cocaine which are has set out below.

Knowledge

        The crack cocaine at issue was found under a chair in which Michael Paige had been sitting. Michael testified that the crack was in his possession, he placed it in the back of the chair, and the Defendant knew nothing about it. There was, however, testimony by Trooper Horton and Detective Dunn that they believed the Defendant and Michael were part of a drug organization. However, Michael denied any participation in the organization and the Defendant was not asked if he was part of the organization.

Relationship with the Person Found in Actual Possession

        Neither Michael nor the Defendant actually possessed the crack cocaine when it was discovered by police. There is no evidence of a relationship between Michael and the Defendant other than testimony by Trooper Horton and Detective Dunn that they believed the Defendant and Michael were part of a drug organization.

Access to the Area

        Vertner, the homeowner, testified that when police entered his home, the Defendant was in the kitchen by the sink and the ice box and he sat down at that time. Vertner did not testify where the Defendant sat. Babers, who was also inside the home when the Defendant entered, testified that the Defendant stood by the table, went toward the front door, and returned to the table. He testified that the Defendant never sat on the cooler.

        Michael testified that the Defendant sat at the table and never sat on the cooler. The Defendant testified that he stood between the table and the love seat, which was across from the chair Michael sat in. He walked toward the front door then returned

13

to the table, which was where he was when police entered the home. After police asked who got out of the vehicle, he sat in a chair. The Defendant did not indicate what chair he sat in.

Trooper Horton testified that the Defendant was standing by the chair when he entered the residence and later testified that he was sitting on a cooler next to the chair Michael sat in. Detective Henson also testified that the Defendant was sitting on the cooler next to the chair.

Evidence of Recent Drug Use

There was no evidence presented regarding recent drug use by the Defendant.

Physical Proximity to the Drugs

The Defendant and Michael were in the same vehicle for a short period of time prior to the vehicle being stopped by police.

Testimony of police put the Defendant next to the chair under which the crack cocaine was found. However, the testimony of other witnesses indicates the Defendant was not next to the chair. We are unaware of the size and layout of Vertner's home. Additionally, Detective Henson testified that photographs are typically taken in cases such as this. However, no photos were taken in the case at bar.

We find the evidence regarding the Defendant's proximity to the drugs is conflicting.

Evidence that the Area was Frequented by Drug Users

There was no testimony that Vertner's home was frequented by drug users.

Cases

In *State v. Hines*, 02-397 (La.App. 5 Cir. 9/30/02), 829 So.2d 530, police executed a search warrant at the defendant's apartment and arrested the defendant for

14

possession with intent to distribute marijuana. The defendant was subsequently convicted of attempted possession of marijuana with intent to distribute.

At trial, the defendant's sister, Kioca Hines did not testify. The State relied on a note of evidence taken at Kioca's guilty plea. At her guilty plea, Kioca testified that she brought the marijuana to the defendant's apartment and that she was the only one bagging the marijuana. Kioca also testified that when the defendant became aware that she brought the marijuana into the apartment, the defendant complained about it. In addition to this evidence, none of the officers saw the defendant packaging drugs. The defendant was simply sitting on the sofa smoking a marijuana cigar. The defendant argued that Kioca, who admitted ownership of the marijuana, was the only person guilty of possession with intent to distribute marijuana.

The fifth circuit found that a reasonable juror could have concluded beyond a reasonable doubt that the defendant attempted to possess the marijuana with intent to distribute, stating the following:

> [T]he evidence seized from defendant's apartment, coupled with the officers' testimony, established the essential elements of attempted possession with intent to distribute marijuana. When the police entered defendant's apartment, defendant was seated on a sofa with several other people where a total quantity of 150 grams of marijuana was located in open view near the sofa. Nearly one-fourth (31.8 grams) of that marijuana was packaged in eighteen small plastic bags. According to Agent Synigal's testimony, defendant's sister was holding a bag containing marijuana, and defendant was holding a "blunt," which she threw to the floor upon the officers' entry.
>
> Virtually all of the factors set out in *Williams* are present, leading to the conclusion that the marijuana was subject to the defendant's control.[2] There was evidence of recent drug use, since defendant was smoking marijuana at the time the police entered the apartment, and remnants of marijuana cigars were recovered from the living room. Further, defendant is related to the person who was in actual possession, since Agent Synigal stated that he believed Michelle Hines, defendant's sister, was holding the bag of marijuana when the police entered.

---

[2]This reference is to *State v. Williams*, 98-1006 (La.App. 5 Cir. 3/30/99), 735 So.2d 62, 69, *writ denied*, 99-1077 (La. 9/24/99), 747 So.2d 1118.

> Defendant was in close proximity to where the marijuana and the Baggies were found. And a digital scale was found in the apartment, which Kioca Hines acknowledged that she used on this occasion to weigh the marijuana.
>
> Although defendant points out that Kioca Hines' claim of full responsibility is a reasonable hypothesis of the defendant's innocence, the jury obviously did not believe Kioca Hines' testimony. The question of the credibility of the witnesses is within the sound discretion of the trier of fact, who may accept or reject, in whole or in part, the testimony of any witness. The credibility of the witnesses will not be re-weighed on appeal. *State v. Rowan*, 97-21 (La.App. 5 Cir. 4/29/97), 694 So.2d 1052, 1056.

*Id*. at 537 (footnote added).

In *State v. Douglas*, 30,393 (La.App. 2 Cir. 2/25/98), 707 So.2d 512, police executed a search warrant for the home of Steven Ray Jones and a woman believed to be his sister. Between the mattress and the headboard of the bed in the northeast bedroom where Melinda Jones was sleeping, police found a potato chip bag containing 189 individually packaged rocks of crack cocaine. They also found two 9 mm pistols. In a dresser drawer, police found a checking account deposit slip and insurance papers, both in the name of Melinda Jones. Other items in the bedroom included men's and women's clothing and baby care items.

Police described the northwest bedroom as a storage room. In this room, which contained no bed, police found tires, new baby clothes, and a "bunch" of men's clothes. In the corner of the top shelf of the closet, police found the defendant's driver's license. A .32 ACP pistol was sitting next to the license. Hanging in the closet was a purple shirt containing five rocks of crack cocaine and fifty dollars in cash. The defendant and Jones were both arrested and charged with possession with intent to distribute cocaine.

The defendant testified that Steven Jones requested that he stop by the home to check on Melinda. While he was sitting in the living room on the phone, police

16

entered the home. The defendant testified that he did not know there were drugs in the house. Further, he had lost his driver's license weeks before the incident, and he was not surprised that his license was in the house because he had been to various parties there in the past. Police did not testify about the defendant's location in the residence or what he was wearing at the time, so as to suggest that the purple shirt was his. At trial, the State failed to present any evidence that the defendant had lived at the house prior to his arrest or had returned to the home thereafter.

In its ruling, the second circuit discussed the following cases:

> In *State v. Cann*, [319 So.2d 396 (La.1975)] *supra*, officers executing the search warrant found the defendant in a bedroom behind locked doors. No contraband was found on him or in the bedroom. Marijuana was found in the kitchen in plain view. Yet, the apartment belonged to someone else, and other people were found in the apartment. The court found that the evidence was not sufficient to uphold a finding that the defendant had constructive possession of the drugs. The court emphasized that there was no evidence that the defendant knew or had reason to know that the marijuana was in the kitchen, that he lived there, that he had been in the apartment on other occasions, that drugs were found on the defendant or in the bedroom where he was found, or that he had or shared possession, dominion, or control over the marijuana in the house.

> In *State v. Harris*, [597 So.2d 1105 (La.App. 2 Cir. 1992)] *supra*, the defendant, who was not shown to be a resident of the dwelling, was sitting on a couch with another party when police officers entered the house. The search of the house revealed a matchbox of cocaine behind the couch. This court, overturning a jury verdict against defendant, held that constructive possession of the matchbox by the defendant was not sufficiently proven since it was possible for either of the two parties on the couch to have dropped the drugs at the time of the arrest.

> The above cases struggle with the establishment of constructive possession in search and seizure settings involving the presence of multiple parties where no actual possession of the illegal substance is present. These are circumstantial evidence cases. Under certain factual settings, shared constructive possession by all the parties might be inferred and substantially proven. Yet, in other settings, some of the parties' proximity to the contraband and their prior access to and occupancy of the area may be much stronger than the more casual connection of the other persons with the scene. In such cases, the inferences indicating the stronger dominion and control of the actual

17

occupants of the area can cast reasonable doubt on the implication of the constructive possession of the other parties present on the premises.

When the body of circumstantial evidence gives rise to more than one hypothesis, our supreme court has said:

> In all cases where an essential element of the crime is not proven by direct evidence, La. R.S. 15:438 applies. As an evidentiary rule, it restrains the factfinder in the first instance, as well as the reviewer on appeal, to accept as proven all that the evidence tends to prove and then to convict only if every reasonable hypothesis of innocence is excluded. Whether circumstantial evidence excludes every reasonable hypothesis of innocence presents a question of law. *State v. Hammontree*, 363 So.2d 1364 at 1374 (La.1978); *State v. Schwander*, 345 So.2d 1173 at 1175 (La.1977); *State v. Smith*, 339 So.2d 829 at 833 (La.1976). In applying La. R.S. 15:438, all the facts that the evidence variously tends to prove on both sides are to be considered, disregarding any choice by the factfinder favorable to the prosecution. *The reviewer as a matter of law can affirm the conviction only if the reasonable hypothesis is one favorable to the state and there is no extant reasonable hypothesis of innocence.*

*State v. Shapiro*, 431 So.2d 372 (La.1982). (Emphasis added.)

*Id*. at 515-16.

The second circuit noted that the state introduced no evidence of Douglas's occupancy of the house or recent visits by Douglas to the home. Additionally, the state did not attempt to prove his location in the house at the time of the arrest. Further, the cocaine was not in Douglas's view. The second circuit concluded that, under this weak body of evidence, Douglas's knowledge of the existence of the cocaine hidden in the house was not established.

However, the state admitted that Steven Jones lived in the house, and the evidence showed that Melinda Jones frequented the premises and was found asleep in the bedroom at the time of the arrest. The Jones's occupancy of the residence and Melinda's close proximity to the cocaine found in the bedroom strongly indicate their dominion and control over the contraband; thus, raising an alternative hypothesis

18

which created a reasonable doubt regarding Douglas's guilt. This alternative hypothesis of the Jones's control of the contraband remained on the face of the state's case regardless of Douglas's explanation of his presence in the house, an explanation which the jury rejected.

The second circuit further noted that the presence of Douglas's driver's license in the storage closet was circumstantial evidence tending to show a possible prior connection with the house but it was not strong enough to overcome the Jones's primary occupancy of the house. The driver's license was not found in the shirt where the cocaine was located, and the stronger inference drawn from Stephen Jones's occupancy indicated that the shirt belonged to him and not Douglas.

The second circuit concluded, having failed to prove that Douglas knew that the cocaine was in the Jones's residence and that he had dominion and control over it, the state's case against Douglas was insufficient to prove constructive possession. Further, the circumstantial evidence failed to exclude every reasonable hypothesis of innocence.

In *State v. Schroeder*, 572 So.2d 708 (La.App. 4 Cir. 1990), the defendant, along with co-defendant Vauchon Cojoe, were charged with possession of cocaine. Cojoe pled guilty, and the defendant was found guilty by a jury. Police officers testified they witnessed the defendant and Cojoe approach a man the officers knew to be a drug dealer. Cojoe gave the man currency. The dealer walked into a hallway, returned immediately, and gave Cojoe a small object. The defendant and Cojoe walked away. Cojoe then gave the defendant a folded brown piece of paper. The defendant unfolded it and examined the contents. Police pulled up in an unmarked vehicle. The defendant threw the paper to the ground and kicked it under a parked car. Cojoe testified that he possessed the cocaine and threw it to the ground.

19

The fourth circuit concluded the jury apparently chose to believe the police. Additionally, the defendant's act of throwing the drugs to the ground indicated the requisite guilty knowledge. The court further noted that even if it were to accept Cojoe's testimony, the defendant's conduct still fell within the realm of constructive possession. The defendant was in an area frequented by drug dealers, he had knowledge of this fact, and was accompanied by an individual who admitted to having actual possession of the drugs. The court stated that alone, each of these facts would be insufficient to convict; however, taken together they indicated that the defendant had dominion and control over the drugs sufficient to find constructive possession.

The case at bar is similar to *Hines*, 829 So.2d 530, in that in both cases, someone other than the defendant claimed ownership of the drugs found inside a home. In *Hines*, the fifth circuit affirmed the defendant's conviction, finding the jury did not believe Kioca's testimony that the drugs were hers. However, the case at bar is distinguishable from *Hines* in that all the factors tending to prove constructive possession were not present. Accordingly, we find the evidence was not sufficient to prove the Defendant had constructive possession of the crack cocaine at issue.

Additionally, based on *Harris*, 597 So.2d 1105, which was cited by the second circuit in *Douglas*, 707 So.2d 512, the State failed to prove the Defendant constructively possessed the crack cocaine found under the chair, as Michael had been sitting in the chair and it was possible that either he or the Defendant placed the crack cocaine there.

Although the fourth circuit affirmed the defendant's conviction in *Schroeder*, 572 So.2d 708, that case is distinguishable from the case at bar. In the case at bar, the Defendant was in the company of an individual who admitted to possessing crack

20

cocaine. However, there was no evidence the Defendant was aware that Michael

possessed cocaine. Further, there was no evidence that the Defendant and Michael

were in an area frequented by drug dealers.

PRINCIPAL

In its closing argument, the State asserted that Michael possessed the crack

cocaine and the Defendant was a principal to the offense of possession with intent to

distribute crack cocaine.

> The state need not prove actual possession or actual dominion and
> control over a controlled dangerous substance when the state proves that
> a defendant is a principal in the crime under La. R.S. 14:24. *State v.
> Green*, 476 So.2d 859 (La.App. 2d Cir.1985), *writ denied*, 481 So.2d
> 627 (La.1986). Under La. R.S. 14:24, all persons concerned in the
> commission of a crime, whether present or absent, and whether they
> directly commit the act constituting the offense, aid and abet in its
> commission or directly or indirectly counsel or procure another to
> commit the crime, are principals.

*State v. Lewis*, 42,365, pp. 5-4 (La.App. 2 Cir. 9/19/07), 965 So.2d 971, 975.

In *Lewis*, police set up surveillance at a residence belonging to Bruce Marshall,

following a report from a confidential informant regarding illegal drug activity

involving the defendant, Quierza Lewis, and Kelly Combs, Lewis's cousin. When

law enforcement arrived, they observed Combs and Lewis leaving the residence.

Combs got into his vehicle and Lewis sat in the passenger seat of a black Grand Am,

where his girlfriend, Bridget Sumlin, was waiting in the driver's seat. A few minutes

later, Lewis got out of the Grand Am and into the driver's seat of Combs's vehicle.

The two vehicles then drove a couple of blocks to the home of Lewis's mother.

Officers, in a marked patrol car, pulled directly behind Combs's vehicle. Lewis and

Combs exited the vehicle and went inside the residence, while Sumlin remained in

the Grand Am outside. After police officers pursued the two into the residence and

detained them, the officers made contact with Sumlin, who turned over a black skull

cap containing a silver pair of digital scales, razor blades, and a box of baggies. While waiting on a search warrant for Sumlin's car, police officers returned to Marshall's house where the officers discovered several items consistent with the manufacturing of crack. After the search warrant for Sumlin's vehicle was obtained, officers seized a plastic bag containing cocaine from Sumlin's purse.

Combs, Sumlin, and Lewis were all placed under arrest and charged with possession of cocaine in excess of 200 grams but less than 400 grams. Lewis was subsequently convicted of possession of cocaine in an amount in excess of 28 grams but less than 200 grams.

Marshall corroborated the information obtained from the informant during his testimony at trial. He testified that Lewis called and asked if he and Combs could cook some cocaine at his house, and that Lewis offered to pay him money in exchange. He testified that he saw Lewis walk to Sumlin's car after the cocaine had been cooked, but he could not recall seeing Lewis with anything.

Sumlin also testified at trial. She stated that on the previous day, she and her friend Shameka Moore followed Combs and Lewis to Texas. Lewis and Combs rode together in the same vehicle while Sumlin and Shameka followed behind in her car. Sumlin explained that Lewis did not tell her the reason for the trip to Texas and she did not question him about it. Once they arrived in Dallas, Sumlin testified they met up with one of Lewis's friends who led them to a house. Sumlin stated that she and Shameka remained at the house while Lewis and Combs left with their friend. When Lewis returned, Sumlin stated that he handed her a brown paper bag which she placed in the glove compartment.

Sumlin testified that once they were home, Lewis removed the bag from her vehicle. The following day, Lewis called her and asked for a ride to Marshall's

22

residence. According to Sumlin, Lewis called again later that day with instructions to retrieve the brown paper bag from his mother's house and to bring it to Marshall's residence where he was located. Sumlin testified that once she arrived at Marshall's house, Lewis came outside and placed a zip-lock bag containing crack cocaine inside her car. He also placed a silver scale and a black skull cap inside her vehicle. Thereafter, Lewis told her to meet him at his mother's house. Lewis and Combs followed behind her in another car. She testified that once they arrived at the residence, the police arrived.

The second circuit found the evidence was sufficient to support Lewis's conviction. In short, the facts establish that Quierza Lewis traveled to Dallas to obtain the cocaine, used Bridget Sumlin to transport the cocaine, cooked the cocaine at Bruce Marshall's house, and was a principal in this case. Lewis aided and abetted in the commission of the offense and directly counseled and procured another, Sumlin, to commit the crime. Sumlin, for the most part, acted as a courier on his behalf so that Lewis would never be caught with the narcotics in his possession. Further, Lewis gave instructions to Sumlin regarding the transportation of the drugs and closely monitored Sumlin's movement when she had actual possession of the drugs. At all times, Lewis controlled how and when the drugs would be transported from one place to another.

Testimony was also presented that Lewis tried to distance himself from the narcotics when the police arrived at his mother's residence. The second circuit concluded that although Lewis did not have actual possession of the drugs, the weight of the evidence established that he did have constructive possession.

In *State v. Brady*, 97-1095 (La.App. 4 Cir. 2/3/99), 727 So.2d 1264, *rehearing granted on other grounds*, (La.App. 4 Cir. 3/16/99), "Moms" flagged down Officer

23

Mercadel. Officer Mercadel walked up to "Moms," she asked him what he wanted, and he said a twenty-dollar bag. She called out to Howell, who asked the officer what he wanted, and then took the twenty dollars from him, all while inside of one-half of a double residence. Howell walked out of that side of the residence, to the door of the other half of the residence, and handed the twenty dollars to someone inside - presumably Brady. Howell then informed Officer Mercadel that Brady would take care of him, and Brady subsequently walked out of his residence and handed Officer Mercadel a packet of heroin. Brady was taken into custody, frisked for weapons, and placed in the rear of a police unit. Officers subsequently saw Brady moving in the rear of the police unit and discovered pills on the seat next to him. Officer Mercadel then recovered a plastic bag containing more pills from Brady's rear pocket. There was no testimony that any pills were recovered from inside of the residence.

Howell argued that he could not be charged with constructive possession of the pills that were in Brady's pocket. The fourth circuit concluded that a rational trier of fact could have found beyond a reasonable doubt that Howell was a principal to Brady's sale of heroin to Officer Mercadel, that Howell was acting in concert with Brady in distributing heroin to Officer Mercadel, and thus, Howell had constructive possession of the heroin. The fourth circuit found that it did not necessarily follow that it would be a proper inference from Howell's actions that he was acting in concert to sell pills that Brady had on his person. The fourth circuit noted that Brady had no heroin on his person and was not selling cocaine from a stash on his person. He was selling heroine and cocaine from his residence, where those drugs were in plain view. Further, Officer Mercadel received information that heroine and cocaine were being sold from the residence, not pills. The fourth circuit reversed Howell's conviction for possession of the pills, noting that "it cannot be said that any rational

24

trier of fact could have found beyond a reasonable doubt that Howell had constructive possession of the pills secreted on Brady's person. Such an inference would be too speculative." *Id*. at 1270.

We find this case is most similar to *Brady*, 727 So.2d 1264, in which Brady had drugs in his pocket and the court concluded that Howell did not have constructive possession of those pills. Further, although the State would have the jury believe that the Defendant and Michael were part of a drug organization, there was no testimony regarding surveillance that linked the Defendant to the drug organization as there was in *Lewis*, 965 So.2d 971. There was, however, a recorded conversation between the Defendant and Marvin Paige, but the two did not openly discuss drugs during that conversation. Thus, the State failed to present proof that the Defendant directly committed the act constituting the offense, aided and abetted in its commission, or directly or indirectly counseled or procured Michael to commit possession with intent to distribute crack cocaine.

For the reasons asserted herein, we find the State did not prove the Defendant was a principal to Michael's possession with intent to distribute crack cocaine.

RESPONSIVE VERDICTS

"[W]hen a court finds that the evidence was not sufficient to support a verdict for the crime charged, the discharge of the defendant is neither necessary nor proper when the evidence supports a conviction of a lesser and included offense which is a legislatively authorized responsive verdict." *State v. Wright*, 36,635, p. 12 (La.App. 2 Cir. 3/7/03), 840 So.2d 1271, 1279. The responsive verdicts to the crime of possession with intent to distribute crack cocaine are attempted possession with intent to distribute crack cocaine, possession of crack cocaine, attempted possession of crack cocaine, and not guilty. La.Code Crim.P. art. 814(49).

25

We find the State cannot prove the Defendant committed any of the responsive verdicts, as the State failed to prove the Defendant constructively possessed the crack cocaine or was a principal to Michael's possession thereof. Therefore, the Defendant's conviction is vacated and his sentence set aside.

## ASSIGNMENT OF ERROR NUMBER TWO

In his second assignment of error, the Defendant contends the trial court abused its discretion in failing to swear in the jury prior to the beginning of trial.

We have not addressed this assignment of error in light of our ruling that the Defendant's conviction be vacated and his sentence set aside.

## CONCLUSION

The Defendant's conviction is vacated and his sentence set aside.

**CONVICTION VACATED; SENTENCE SET ASIDE.**